Clyde C. FREEMAN and Nancy
F. Freeman, Appellants,

v.

FEDERAL DEPOSIT INSURANCE COR-
PORATION, as Receiver for Madison
National Bank, Appellee.

No. 93–5395.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 3, 1995.

Decided June 13, 1995.

Harvey A. Levin, Washington, DC, argued the cause and filed the briefs for appellants.

Kathryn R. Norcross, Counsel, F.D.I.C., Washington, DC, argued the cause for appellee. With her on the brief was Richard J. Osterman, Jr., Sr. Counsel, F.D.I.C., Bethesda, MD. Michelle H. Phillips, Washington, DC, entered an appearance.

Before WALD, SILBERMAN and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

District of Columbia residents Clyde C. Freeman and Nancy F. Freeman brought suit seeking injunctive and declaratory relief to prohibit the Federal Deposit Insurance Corporation ("FDIC" or "Corporation"), as receiver for Madison National Bank ("Madison"), from foreclosing on their home. The Freemans also sought rescission of their underlying loan agreement with Madison, as well as compensatory damages for conversion, wrongful foreclosure, and breach of contract. The United States District Court for the District of Columbia entered summary judgment for the FDIC on the merits, and dismissed the Freemans' claims with prejudice. The Freemans now appeal. Because 12 U.S.C. § 1821(j) barred the district court from granting the equitable relief sought by the Freemans, and because 12 U.S.C. § 1821(d) deprived the district court of jurisdiction to hear *any* of the Freemans' claims, we affirm the district court's dismissal with prejudice without reaching the merits of their claims.

## I. BACKGROUND

In January 1985, Robinson Broadcasting Corporation bought radio station WANT–AM in Henrico County, Virginia, financed by a $600,000 loan from Madison National Bank. The loan was secured by a deed of trust on the 6.2 acres of real estate on which the radio tower was located. The Freemans, together with other stockholders in Robinson Broadcasting ("Robinson"), signed personal guarantees on the $600,000 note.

WANT–AM quickly encountered financial difficulties, and Robinson was unable to meet its repayment obligations. In early 1987, the Freemans sought and received Madison's consent to take over ownership and management of WANT–AM, and in June 1987, the Freemans became sole stockholders of Robinson. The station's financial problems continued, however, and its income was insufficient to service the debt. In January 1989, Madison and the Freemans agreed to a debt restructuring in which Madison would sell its position in the $600,000 note (which by this time had a $559,000 balance) to the Freemans, and thereupon make a new $740,000 loan to the Freemans, secured by a deed of trust on the Freemans' principal residence in the District of Columbia. The proceeds of the new loan would go to purchase the $600,000 note, retire the $75,000 existing debt on the residence, and establish an interest reserve of $106,000. Madison also agreed to lend the Freemans an additional $150,000, secured by a deed of trust on an office building they owned at 5223 Georgia Avenue, N.W. in the District of Columbia, with the loan proceeds to retire existing debt on the Georgia Avenue property and to pay off two other existing loans. Terms of the agreement were outlined in two letters of commitment from Madison to the Freemans, dated January 18, 1989.

One of the letters of commitment expressly provided that after Madison endorsed the $600,000 note over to the Freemans, they would re-endorse the note back to Madison. On February 10, 1989, the transaction closed. The Freemans did in fact re-endorse the $600,000 note back to Madison as provided in the commitment letter, and contemporaneously executed a separate document stating that they were endorsing the note to Madison as "additional collateral" on the $740,000 loan.

The Freemans claim they agreed to the debt restructuring with the intention of collecting on the original stockholders' personal guarantees on the $600,000 note, and using the proceeds to repay Madison. But under the transaction as it actually transpired, they were unable to do so: Madison had possession of the note, and refused either to surrender possession or to take any action itself to collect on the guarantees. In November 1990, the Freemans defaulted on both the $740,000 note secured by their home and the $150,000 note secured by their business property. Madison demanded accelerated payment, and stated that it would begin foreclosure proceedings if payment was not promptly received.

In May 1991, Madison failed. As receiver, the FDIC took possession of the $600,000 note and deed of trust on the Henrico property, as well as the $740,000 note and deed of trust on the Freemans' home and the $150,000 note and deed of trust on their Georgia Avenue office building. Like Madison, the FDIC refused to surrender possession of the $600,000 note, and declined to collect on the original stockholders' guarantees. On April 8, 1992, the FDIC demanded payment on the $740,000 and $150,000 notes, stating that it "intend[ed] to utilize all remedies available," and that both the Freemans' residence and the Henrico County property "may be foreclosed upon" if full payment were not received within twenty days. The Freemans were unable to pay the amount due. On June 1, 1993, the FDIC initiated foreclosure proceedings on the Henrico property. In August, 1993, the FDIC initiated nonjudicial foreclosure proceedings on the Freemans' residence and office building.

On August 18, 1993, the Freemans brought suit in the Superior Court of the District of Columbia, seeking to enjoin the foreclosure on their residence, determine the rights of the parties with respect to the three notes, rescind the February 10, 1989 transaction, and recoup compensatory damages for Madison's alleged conversion, wrongful foreclosure, and breach of the debt restructuring agreement. The Freemans' principal allegation was that Madison had defrauded them by first agreeing to sell them its full rights in the $600,000 note, and then at the last minute inducing them to reassign the note to the bank. They claimed that this changed the essential nature of the deal without their knowledge or assent, and that therefore the entire transaction, including the $740,000 loan agreement and deed of trust on their home, was void *ab initio* on grounds of fraud

in the factum. The Freemans also alleged that by failing to turn over the $600,000 note and to collect from its guarantors, Madison had breached its obligations under the terms of their "bilateral purchase-and-sale" agreement. They further contended that by retaining possession of the $600,000 note, Madison and the FDIC had elected a remedy under the Uniform Commercial Code, taking the $600,000 note in full satisfaction of the Freemans' debt. Finally, they argued that by refusing to collect from the guarantors of the $600,000 note, Madison and the FDIC had impaired the value of the collateral, releasing the Freemans from their obligation to repay the $740,000 loan to the extent of the impairment.

On October 15, 1993, the FDIC removed the case to the United States District Court for the District of Columbia. After initially issuing a temporary restraining order ("TRO"), the district court on December 1, 1994, dissolved the TRO and ruled in favor of the FDIC on its cross-motion for summary judgment on the merits, holding that the FDIC holds the $600,000 note only as collateral on the $740,000 loan. The district court declined to reach two defenses asserted by the FDIC: first, that 12 U.S.C. § 1821(j) bars the equitable remedies sought by the Freemans, and second that 12 U.S.C. § 1821(d) deprives the court of jurisdiction to hear *any* of their claims. The Freemans appeal from the district court's ruling.

## II. ANALYSIS

### A. *Bar Against Judicial "Restraints": 12 U.S.C. § 1821(j)*

The FDIC asserted a defense below based on section 212(j) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, codified at 12 U.S.C. § 1821(j), which states:

Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of the powers or functions of the Corporation as a conservator or receiver.

12 U.S.C. § 1821(j).

The FDIC argues that this provision broadly deprives any court of power to take any action that has the effect of restraining the FDIC, acting in its capacity as receiver, from conducting a nonjudicial foreclosure sale of assets acquired from a failed bank, whether the "restraint" is by injunction, rescission of a contract, or declaratory judgment. We said in *National Trust for Historic Preservation v. FDIC*, 21 F.3d 469 (D.C.Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 683, 130 L.Ed.2d 615 (1994), that "§ 1821(j) does indeed bar courts from restraining or affecting the exercise of powers or functions of the FDIC as a conservator or a receiver ... unless it has acted or proposed to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions." *Id.* at 472 (Wald, J., concurring) (internal quotation and citation omitted). *Accord, Lloyd v. FDIC*, 22 F.3d 335, 336 (1st Cir.1994); *Ward v. Resolution Trust Corp.*, 996 F.2d 99, 103 (5th Cir.1993); *Gross v. Bell Savings Bank*, 974 F.2d 403, 407 (3d Cir.1992). Although this limitation on courts' power to grant equitable relief may appear drastic, it fully accords with the intent of Congress at the time it enacted FIRREA in the midst of the savings and loan insolvency crisis to enable the FDIC and the Resolution Trust Corporation ("RTC") to expeditiously wind up the affairs of literally hundreds of failed financial institutions throughout the country. *See* H.R.REP. No. 101–54(I), 101st Cong., 1st Sess. 291, 307, *reprinted in* 1989 U.S.C.C.A.N. 86, 87, 103.

 In the present case, the FDIC is unquestionably acting in its capacity as "receiver," and as such is authorized by statute to exercise "all rights, titles, powers, and privileges of the insured depository institution ... with respect to ... the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i). This includes the power to "collect all obligations and money due the institution," 12 U.S.C. § 1821(d)(2)(B)(ii), to "place the ... institution in liquidation and proceed to realize upon the assets of the institution," 12 U.S.C. § 1821(d)(2)(E), to "transfer any asset or liability of the institution," 12 U.S.C. § 1821(d)(2)(G)(i)(II), and to "exercise ... such incidental powers as shall be necessary to carry out" these express powers, 12 U.S.C.

§ 1821(d)(2)(I)(i). The exercise of these powers may not be restrained by any court, regardless of the claimant's likelihood of success on the merits of his underlying claims. *Ward,* 996 F.2d at 102. In particular, the FDIC's broad powers as receiver include the power to foreclose on the property of a debtor held by the failed bank as collateral, and no court may enjoin the exercise of that power. *Lloyd,* 22 F.3d at 336–37; *281–300 Joint Venture v. Onion,* 938 F.2d 35, 39 (5th Cir.1991), *cert. denied,* 502 U.S. 1057, 112 S.Ct. 933, 117 L.Ed.2d 105 (1992).

■ Section 1821(j) does indeed effect a sweeping ouster of courts' power to grant equitable remedies to parties like the Freemans. Not only does it bar injunctive relief, but in the circumstances of the present case where appellants seek a declaratory judgment that would effectively "restrain" the FDIC from foreclosing on their property, § 1821(j) deprives the court of power to grant that remedy as well. *See National Trust,* 21 F.3d at 471 n. 2; *Carney v. Resolution Trust Corp.,* 19 F.3d 950, 957–58 (5th Cir.1994). For the same reason, § 1821(j) also bars the court from granting the Freemans' plea for rescission of the underlying transaction. *See Ward v. Resolution Trust Corp.,* 996 F.2d at 104 ("Like injunction, rescission is a 'judicial restraint' that is barred by 1821(j).").

We conclude that under 12 U.S.C. § 1821(j) the district court could not have granted the Freemans' pleas for nonmonetary remedies, including injunctive relief, declaratory relief, and rescission of the promissory note. Nonetheless, as we noted in *National Trust,* serious due process concerns would be implicated if parties aggrieved by the FDIC's actions as receiver were left entirely without remedies. In many cases, however, aggrieved parties will have opportunities to seek money damages or other relief through the administrative claims process provided in 12 U.S.C. § 1821(d), and their claims are ultimately subject to judicial review. *National Trust,* 21 F.3d at 472. It is to that provision that we next turn.

### B. *Jurisdictional Bar of 12 U.S.C. § 1821(d)*

The FDIC next contends that the district court lacked jurisdiction to hear *any* of the Freemans' claims, including claims for compensatory damages, because 12 U.S.C. § 1821(d) bars any court from hearing claims against, or actions to determine rights with respect to, the assets of a failed bank held by the FDIC as receiver unless the claimant first exhausts his administrative remedies by filing claims under the FDIC's administrative claims process.

■ FIRREA's section 212, 12 U.S.C. § 1821, creates an administrative claims process for claims against the assets of failed banks held by the FDIC as receiver. 12 U.S.C. § 1821(d)(3)–(13). The FDIC is authorized to decide such claims under a process established by the statute and FDIC regulations. 12 U.S.C. §§ 1821(d)(3)(A), 1821(d)(4). When liquidating a failed bank's assets, the FDIC must publish a notice "to the depository institution's creditors" specifying a date by which claims must be presented, not less than 90 days after publication, 12 U.S.C. § 1821(d)(3)(B), and in addition must mail a "similar" notice to "any creditor shown on the institution's books," 12 U.S.C. § 1821(d)(3)(C). The FDIC has 180 days after a claim is filed to allow or disallow it. 12 U.S.C. § 1821(d)(5)(A). Claims not timely filed must be disallowed unless "the claimant did not receive notice of the appointment of the receiver in time to file such claim before such date"; in that case, a late-filed claim "may be considered by the receiver," provided the claim is "filed in time to permit payment." 12 U.S.C. § 1821(d)(5)(C). Finally,

[e]xcept as provided in this subsection, no court shall have jurisdiction over—

(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D).

■ Thus no court has jurisdiction to hear any "claim or action for payment from" or

"action seeking a determination of rights with respect to" any "asset" of a failed bank for which the FDIC is receiver, with one relevant exception. Under § 1821(d)(6), both the United States District Court for the District of Columbia and the district court for the district where the financial institution has its principal place of business have jurisdiction to review *de novo* claims filed with, and processed by, the FDIC under its administrative claims process. *See Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 391–92 (3d Cir.), *cert. denied*, 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991). Such an action must be filed in district court within 60 days after the administrative claim is disallowed, or within 60 days after the expiration of the 180–day period allowed for processing the administrative claim, whichever comes first. 12 U.S.C. § 1821(d)(6).

■ The effect of these provisions, read together, is to require anyone bringing a claim against or "seeking a determination of rights with respect to" the assets of a failed bank held by the FDIC as receiver to first exhaust administrative remedies by filing an administrative claim under the FDIC's administrative claims process. *Office and Professional Employees Int'l Union, Local 2 v. FDIC*, 962 F.2d 63, 65–66 (D.C.Cir.1992). As the First Circuit explained, "FIRREA makes participation in the administrative claims review process mandatory for all parties asserting claims against failed institutions," and "where a claimant has ... failed to initiate an administrative claim within the filing period, the claimant necessarily forfeits any right to pursue a claim against the failed institution's assets in any court." *Marquis v. FDIC*, 965 F.2d 1148, 1151–52 (1st Cir.1992) (citation omitted). Section 1821(d)(13)(D) thus acts as a jurisdictional bar to claims or actions by parties who have not exhausted their § 1821(d) administrative remedies. *Brady Development Co., Inc. v. Resolution Trust Corp.*, 14 F.3d 998, 1003 (4th Cir.1994). *Accord, Bueford v. Resolution Trust Corp.*, 991 F.2d 481, 484 (8th Cir.1993); *Henderson v. Bank of New England*, 986 F.2d 319, 320–21 (9th Cir.), *cert. denied*, ⸺ U.S. ⸺, 114 S.Ct. 559, 126 L.Ed.2d 459 (1993); *Meliezer v. Resolution Trust Corp.*, 952 F.2d 879, 882 (5th Cir.1992); *Resolution Trust Corp. v.*

*Elman*, 949 F.2d 624, 627 (2d Cir.1991); *Rosa v. Resolution Trust Corp.*, 938 F.2d at 392. *See also* H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess. 418 (1989), *reprinted in* U.S.C.C.A.N. 86, 214 ("Resort to ... the District Courts ... is available only after the claimant has first presented its claim to the FDIC.").

■ Although each of the Freemans' claims is based upon a distinct legal theory, each ultimately "seek[s] a determination of rights with respect to" an asset of a failed bank for which the FDIC serves as receiver—specifically, Madison's $740,000 loan to the Freemans upon which the FDIC seeks to foreclose. It is undisputed that the Freemans did not file any of these claims through the administrative claims process prior to their filing of this lawsuit. On its face, then, § 1821(d) bars any court from hearing the Freemans' claims.

The Freemans nonetheless contend that § 1821(d) applies only to claims for payment by "creditors" of the failed institution. They insist that as debtors they are not Madison's "creditors" and therefore are not subject to the § 1821(d) jurisdictional bar. This contention, however, does not comport with the statutory language. The statute expressly bars courts from hearing any "claim or action for payment from" or "action seeking a determination of rights with respect to" the assets of a failed bank held by the FDIC as receiver, unless the administrative claims process is exhausted. 12 U.S.C. § 1821(d)(13)(D). As the First Circuit explained in *Marquis*, this jurisdictional bar applies to three distinct kinds of claims or actions: "[1] all claims seeking payment from the assets of the affected institutions; [2] all suits seeking satisfaction from those assets; and [3] all actions for the determination of rights vis-a-vis those assets." *Marquis*, 965 F.2d at 1152. Nor does the statutory text suggest that the jurisdictional bar applies only to "creditors"; on its face, it applies to *anyone* with a "claim for payment" or "action seeking a determination of rights" with respect to the failed institution's assets. *See Lloyd v. FDIC*, 22 F.3d at 337. Concededly, the notice provisions of §§ 1821(d)(3)(B) and

(C) require that the FDIC give notice of the claims period to a failed financial institution's "creditors," but as we noted in *OPEIU, Local 2*, 962 F.2d at 67, "FIRREA's very text appears to contemplate claims beyond those by 'creditor[s] ... on the ... books' to whom statutory notice must be sent." For example, 12 U.S.C. § 1821(d)(13)(D) says that "any claim relating to an act or omission of the institution or the Corporation as receiver" is subject to the § 1821(d) exhaustion requirement.

Our sister circuits have broadly applied the § 1821(d) jurisdictional bar to all manner of "claims" and "actions seeking a determination of rights with respect to" the assets of failed banks, whether those claims and actions are by debtors, creditors, or others. *See, e.g., Lloyd v. FDIC*, 22 F.3d at 337 (suit by debtor seeking equitable reformation or cancellation of mortgage agreement to prevent foreclosure is a "determination of rights with respect to an asset" subject to § 1821(d)(13)(D) jurisdictional bar); *Henderson v. Bank of New England*, 986 F.2d at 321 (claims by unsuccessful credit card applicant for monetary damages and discovery of derogatory credit information are subject to § 1821(d)(13)(D) jurisdictional bar); *Meliezer v. Resolution Trust Corp.*, 952 F.2d at 883 (mortgagor's claim that failed institution was negligent in allowing mortgagor to assume insufficient insurance is subject to § 1821(d)(13)(D) jurisdictional bar); *Resolution Trust Corp. v. Elman*, 949 F.2d at 629 (law firm's defensive assertion of retaining lien to retain custody of legal files of its former client, a failed bank under RTC receivership, is subject to § 1821(d)(13)(D) jurisdictional bar). And in *Local 2, OPEIU*, 962 F.2d at 67, we held that the § 1821(d) administrative claims process is *not* limited to claims by "creditors," so that a union local could pursue an administrative claim on behalf of its members for payment of certain employment benefits, and under § 1821(d)(6) had recourse to *de novo* judicial review of the FDIC's denial of that claim. *But see Homeland Stores, Inc. v. Resolution Trust Corp.*, 17 F.3d 1269 (10th Cir.) (construing § 1821(d)(13)(D) jurisdictional bar narrowly, so as not to bar claims arising after deadline for filing administrative claims), *cert. de-*

*nied,* —— U.S. ——, 115 S.Ct. 317, 130 L.Ed.2d 279 (1994).

The Freemans do garner some support for their position from a handful of recent decisions in bankruptcy cases holding that both the § 1821(d) administrative claims process and the § 1821(d)(13)(D) jurisdictional bar apply only to claims "by creditors" and therefore bankruptcy courts retain jurisdiction over claims "by debtors." *See In Re Parker North American Corp.*, 24 F.3d 1145, 1152–53 (9th Cir.1994) and cases cited therein. The concern underlying these cases is clear: if bankruptcy courts are ousted of jurisdiction over a broad class of claims under the § 1821(d) jurisdictional bar, the unity of the bankruptcy process may be fractured and some bankruptcy-related claims would be determined, at least in the first instance, by FDIC administrative tribunals, which (it is argued) have little expertise in bankruptcy matters. *Id.* at 1153. For the reasons stated above, we do not think this construction of the § 1821(d)(13)(D) jurisdictional bar quite squares with the statutory text. But even if § 1821(d)(13)(D) is narrowly construed as a limitation on bankruptcy courts' jurisdiction in order to effectuate the purposes of the Bankruptcy Code, *id.* at 1155–56, we decline to extend that approach to nonbankruptcy court contexts. To do so would not advance the purposes of the Bankruptcy Code, while it would undercut Congress' core purpose in enacting FIRREA, which was to "ensure that the assets of a failed institution are distributed fairly and promptly among those with valid claims against the institution," *Local 2, OPEIU*, 962 F.2d at 68, and to expeditiously "wind up the affairs of failed banks," *id.* at 64. *Cf. Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 584–85, 109 S.Ct. 1361, 1374–75, 103 L.Ed.2d 602 (1989) (to liquidate a failed institution's assets "in an orderly manner," the receiver would require timely notice of "the entire array of claims" against an insolvent institution and "an initial opportunity to consider them in a centralized claims process" in order "to make rational and consistent judgments regarding which claims to allow or contest" or to "settle ... without resort to costly litigation").

We therefore hold that the § 1821(d) jurisdictional bar is not limited to claims by "creditors," but extends to all claims and actions against, and actions seeking a determination of rights with respect to, the assets of failed financial institutions for which the FDIC serves as receiver, including debtors' claims. The Freemans' claims fall within the scope of that provision.

■ Finally, the Freemans contend that they were not required to exhaust their administrative remedies because they never received notice of the period within which claims were to be filed, as required by § 1821(d)(3)(C) which provides: "The receiver shall mail a notice [of the period within which claims are to be filed] ... to any creditor shown on the institution's books...." 12 U.S.C. § 1821(d)(3)(C). The FDIC produced an affidavit from an FDIC official stating that the required notices had been mailed to creditors listed on Madison's books, including the Freemans, but the Freemans deny having received such a notice. Even if the Freemans never received the required § 1821(d)(3)(C) notice, however, they were still obliged to exhaust their administrative remedies as a condition of obtaining access to the district court.

■ The Fifth Circuit squarely addressed this question in *Meliezer*, 952 F.2d at 882–83, and concluded that the receiver's failure to mail the notice required under 12 U.S.C. § 1821(d)(3)(C) does not relieve the claimant of the obligation to exhaust administrative remedies, because the statute does not provide for a waiver or exception under those circumstances. *Accord, Intercontinental Travel Marketing, Inc. v. FDIC*, 45 F.3d 1278, 1285 (9th Cir.1994); *but cf. Whatley v. Resolution Trust Corp.*, 32 F.3d 905, 910 & n. 1 (5th Cir.) (Duhe, J., concurring) (suggesting that failure to mail § 1821(d)(3)(C) notice would deprive the receiver of authority to determine administrative claims and relieve the claimant of its obligation to exhaust administrative remedies), *reh'g and reh'g in banc denied*, 38 F.3d 760 (5th Cir.1994). In our view, *Meliezer* and *Intercontinental Travel Marketing* correctly interpret the statute. The *only* statutorily-specified exemption from the strict requirements of the administrative claims process is provided if "the claimant did not receive *notice of the appointment of the receiver* in time to file ... [a] claim," 12 U.S.C. § 1821(d)(5)(C) (emphasis added), and even in that case the only consequence is that the FDIC "may" consider a late-filed claim, provided the claim is filed "in time to permit payment." *But cf. Heno v. FDIC*, 20 F.3d 1204 (1st Cir.1994) (deferring to FDIC's interpretation of § 1821(d)(5)(C) as also authorizing FDIC to process late-filed claims that accrue after the bar date). That § 1821(d)(5)(C) *expressly* provides for a *partial* exemption for failure to provide notice undercuts appellants' argument that we should find an *implicit total* exemption from the claims process for failure to provide notice in § 1821(d)(3)(C); had Congress intended to provide such a broad exemption, it surely would have said so. *See Intercontinental Travel Marketing*, 45 F.3d at 1285.

■ Here, it is undisputed that the Freemans *did* have timely notice of the appointment of the FDIC as receiver, whether or not they received the specific notice required to be mailed under § 1821(d)(3)(C). The FDIC sent a certified letter to the Freemans, dated April 8, 1992, explicitly stating that the FDIC had been appointed receiver, demanding payment on both the $740,000 and the $150,000 notes, and warning that the Freemans' residence "may be foreclosed upon" if payment is not made. Because they received "notice of the appointment of FDIC as receiver," the Freemans were not relieved of their obligation to proceed through the normal administrative claims process.

We conclude that under § 1821(d)(13)(D), the district court lacked jurisdiction to hear *any* of the Freemans' claims. The district court would have jurisdiction only to review *de novo* the FDIC's determination of their administrative claims. The Freemans were thus required to exhaust their administrative remedies before bringing their claims to court, and by failing to do so, deprived the court of jurisdiction.

### C. Due Process

The Freemans challenge the application of §§ 1821(d) and 1821(j) to their case on due

process grounds, contending they were denied an opportunity to be heard before being deprived of their property. Their constitutional challenge is without merit.

■ The Due Process Clause of the Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." The "root requirement" of due process is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Boddie v. Connecticut*, 401 U.S. 371, 378–79, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) (emphasis in original). "The purpose of this requirement is not only to ensure abstract fair play to the individual" but "to minimize substantively unfair or mistaken deprivations of property...." *Fuentes v. Shevin*, 407 U.S. 67, 80–81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972).

■ Undoubtedly, the Freemans have a constitutionally protected property interest in their home. *See United States v. James Daniel Good Real Property*, —— U.S. ——, ——, 114 S.Ct. 492, 501, 126 L.Ed.2d 490 (1993); *Propert v. District of Columbia*, 948 F.2d 1327, 1331 (D.C.Cir.1991). Although "[w]e tolerate some exceptions to the general rule requiring predeprivation notice and hearing ... in extraordinary situations," *James Daniel Good Real Property*, —— U.S. at ——, 114 S.Ct. at 501 (citation and quotation omitted), the government does not assert that such an exception is required here. Assuming without deciding that this case

does not involve an "extraordinary situation" and the Freemans *are* entitled to predeprivation notice and opportunity to be heard, their due process challenge to the applicability of § 1821(d) and § 1821(j) is unavailing because they had notice of the deprivation and an opportunity to be heard prior to the deprivation.

■ In *National Trust* we raised the possibility that under some circumstances the denial of injunctive relief under § 1821(j) could constitute a violation of due process. *National Trust*, 21 F.3d at 473 (Wald, J., concurring). And in some circumstances, the jurisdictional bar of § 1821(d) might also implicate due process concerns by denying an aggrieved party *any* avenue of relief, administrative or judicial.[1] *See Homeland Stores*, 17 F.3d at 1274 n. 5; *National Union Fire Ins. Co. v. City Savings, F.S.B.*, 28 F.3d 376, 392 (3d Cir.1994). But such is not the case here. The Freemans had an opportunity to present their claims to the FDIC, and to have all those claims resolved through the administrative claims process prior to foreclosure, subject to *de novo* judicial review in the district court. The essential facts of their dispute with Madison were well known to the Freemans, and their claims had accrued long before the September 28, 1992 deadline set by the FDIC for filing claims involving Madison's assets under the § 1821(d) administrative claims process. The FDIC's April 8, 1992 certified letter to the Freemans not only put them on notice that the FDIC had been appointed receiver for Madison, but notified them of the impending deprivation of their property,[2] ex-

1. For example, if the claimant's claim does not accrue until *after* the deadline set by FDIC for filing administrative claims, the administrative claim would apparently be barred as untimely, yet § 1821(d)(13)(D) would apparently deprive any court of jurisdiction over the claim because it had not been submitted to the administrative process. *But see Heno v. FDIC*, 20 F.3d at 1209 (affirming as reasonable FDIC's construction of § 1821(d)(5)(C) to authorize it to process a late-filed claim if the claim itself does not accrue until after the bar date).

2. The FDIC's April 8, 1992 letter did not apprise the Freemans of their opportunity to pursue their claims through the administrative claims pro-

cess. Although the Freemans do not make a due process argument based on lack of notice of the claims process, we note that if they were not afforded notice of their exclusive opportunity to present their claims, serious due process concerns would be implicated, for notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

Nancy Freeman states in an affidavit that to the best of her and her husband's recollection, they did not receive the notice the FDIC was required to send under 12 U.S.C. § 1821(d)(3),

plicitly stating that the Freemans had defaulted on the $740,000 loan for which the FDIC as receiver held a deed of trust on their home, demanding payment, and stating that if they failed to make payment in full "FDIC intends to utilize all remedies available" including foreclosure on the deed of trust on their home. Thus the Freemans had actual notice of the impending deprivation some four and one-half months before the September 28 deadline for filing administrative claims.[3] At that point they could have filed claims seeking a determination by the FDIC of their rights and obligations under the various notes and agreements at issue here. Specifically, upon receiving the April 8 notice, they could have brought claims to the FDIC contending that they had no obligations under the $740,000 note on grounds that the transaction was void for fraud in the factum; that Madison had breached the "bilateral purchase and sale agreement"; that Madison and the FDIC had elected a remedy under the Uniform Commercial Code by retaining possession of the $600,000 note in full satisfaction of their $740,000 debt; and that Madison and the FDIC had impaired the value of the $600,000 note as collateral by declining to collect from the guarantors, relieving the Freemans of their obligations under the $740,000 note to the extent of the impairment. Not only could they have brought these claims before the FDIC's administrative claims process, but if they were not satisfied with the results there they could have proceeded to seek *de*

---

see supra Part II.B., which would have informed them of the claims process. The FDIC responds with an affidavit by an FDIC official stating his personal knowledge that the required notice was sent to all "creditors ... on [Madison's] books," including the Freemans. The district court made no finding as to whether the required notice was given, but the contentions of the parties are not necessarily inconsistent: it is possible that the FDIC sent the required notice, and yet the Freemans never received it.

Whether or not the FDIC sent the required notice, however, the matter is best addressed through equitable tolling of the time bar if the Freemans did not have actual notice of the administrative claims process in time to file their claims. We think the time bar here is, like the requirement of timely filing of an administrative claim as a prerequisite to a Title VII suit, essentially "a statute of limitations ... subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). And it is well established that equitable tolling principles apply against the government, just as against private parties. *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 457–58, 112 L.Ed.2d 435 (1990). Courts may allow equitable tolling of a statute of limitations where "a claimant has received inadequate notice." *Mondy v. Secretary of the Army,* 845 F.2d 1051, 1057 (D.C.Cir.1988) (quoting *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 151, 104 S.Ct. 1723, 1725, 80 L.Ed.2d 196 (1984) (per curiam)). *See, e.g., Bayer v. United States Dept. of Treasury,* 956 F.2d 330, 332–33 (D.C.Cir.1992) (before filing formal complaint alleging discrimination in federal employment, complainant must notify Equal Employment Opportunity counselor within 30 days after allegedly discriminatory event; but this time bar is subject to equitable tolling where complainant "was not notified of the time limits and was not otherwise aware of them"). Although the FDIC undoubtedly has a strong interest in expeditiously winding up the affairs of failed institutions, the equities will favor tolling where strict application of the bar date would deprive the complainant of any meaningful opportunity to be heard. *See Bayer,* 956 F.2d at 333. *Cf. Heno v. FDIC,* 20 F.3d at 1209 (construing 12 U.S.C. § 1821(d)(5)(C) to allow processing of late-filed claims that do not accrue until after the bar date, so as not to deny claimants all opportunity to be heard). If the FDIC were to disallow as untimely any administrative claims the Freemans might file, they would be entitled to *de novo* review in the district court, where they may "plead[ ] and prov[e] ... 'equitable reasons' for noncompliance" with the time bar, *Bayer,* 956 F.2d at 333 (quoting *Saltz v. Lehman,* 672 F.2d 207, 209 (D.C.Cir.1982)), including their inability to make a timely administrative filing due to lack of actual notice of the administrative claims process.

**3.** Authorities are divided as to whether the type of notice the Freemans received on April 8, 1992—stating that they were in default and that the FDIC intended to foreclose at some unspecified future date—is adequate notice of a foreclosure. *Compare Ricker v. United States,* 417 F.Supp. 133, 138–39 (D.Me.1976) (notice of default stating intent to foreclose is merely a "threat of foreclosure," not adequate notice of foreclosure) *with Vail v. Brown,* 841 F.Supp. 909, 914–15 (D.Minn.) (notice of default stating intent to foreclose is adequate notice of foreclosure, even if date and time of foreclosure sale are not specified), *aff'd,* 39 F.3d 208 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2245, 132 L.Ed.2d 254 (1995). Here, however, because the Freemans do not allege that they were given inadequate notice of the foreclosure, we must deem that argument waived. The Freemans instead complain that they lacked a predeprivation opportunity to be heard; for the reasons stated in the text, that contention is without merit.

*novo* review in the district court, so long as they filed their action within 60 days after the FDIC's 180–day period for determining their claims, or within 60 days after the date of the FDIC's actual determination of their claim, whichever came first. *See* 12 U.S.C. § 1821(d)(6). If they had filed their administrative claims upon receipt of the FDIC's April, 1992 notice, they would have had an opportunity to file for review in district court by October, 1992 at the very latest—some 10 months before the FDIC initiated final foreclosure proceedings on their home in August, 1993. In sum, the Freemans had a predeprivation opportunity to be heard on each of the claims they later attempted to assert in court.

The Supreme Court has long recognized that the process that is due will vary in form "appropriate to the nature of the case," *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), depending on such factors as the nature of the private interest affected, the risk of erroneous deprivation, and the government's interests, including fiscal and administrative burdens. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). But as the Third Circuit cogently noted in response to a similar challenge to the § 1821(d) administrative process, we "find no ... support for ... [the] position that the opportunity for a *de novo* court action six months after they file their [administrative] claims fails to provide them meaningful review." *Rosa,* 938 F.2d at 397.

We do not know, and cannot speculate, what the outcome would have been had the Freemans exhausted their administrative remedies. Nonetheless, one possible outcome gives us pause. If the complainant's administrative claims are disallowed and the complainant proceeds to seek *de novo* judicial review as prescribed in § 1821(d), then § 1821(j) on its face would appear to bar the district court from granting injunctive or declaratory relief, or rescission of the underlying agreement, at least to the extent the relief granted would "restrain" the FDIC from exercising its powers as receiver. *See supra,* Part II.A. In some circumstances this might so tie the reviewing court's hands

that the court would be unable to grant meaningful predeprivation relief, bringing the constitutional adequacy of the complainant's predeprivation review into question. *See Fuentes,* 407 U.S. at 80, 92 S.Ct. at 1994 ("opportunity to be heard must be granted at a meaningful time and in a meaningful manner," and must generally occur in a time and manner that would allow the deprivation to be prevented) (internal quotation and citation omitted). But that certainly is not what actually transpired here, nor is there any reason to assume that if the Freemans had proceeded through the administrative claims process they would have faced such a problem. The Freemans might have won relief at the agency level. Even if they won no relief at that stage, the factual and legal issues might have appeared in a wholly different light by the time they sought judicial review. Finally, even if a constraint like the one we have described were to arise at the stage of judicial review, the reviewing court might construe the statute so as to avoid constitutional difficulties. *See International Ass'n of Machinists v. Street,* 367 U.S. 740, 749, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961) ("Federal statutes are to be so construed as to avoid serious doubt of their constitutionality."); *cf. Homeland Stores,* 17 F.3d at 1273–74 (construing § 1821(d)(13)(D) jurisdictional bar narrowly so as not to deprive complainant of all opportunities for administrative or judicial relief); *Heno v. FDIC,* 20 F.3d at 1209 (construing § 1821(d)(5) to authorize FDIC to process a late-filed claim if the claim arose after the bar date, so as not to deprive claimant of all opportunities for administrative or judicial relief). We are in no position at this juncture to foretell whether such a case might ever arise, what it might look like, or how it might be resolved. It would be premature and beyond the scope of our Article III powers to read a judicially-crafted exemption into either § 1821(d) or § 1821(j) in anticipation of theoretically possible yet only dimly perceived due process concerns that are not squarely presented by the case before us. *See National Union Fire Ins. Co.,* 28 F.3d at 392.

We conclude that the Freemans did have predeprivation notice and an opportunity to be heard, and therefore they were not denied

due process. That they failed to avail themselves of the statutorily-prescribed administrative claims process, and thereby waived their right to pursue their claims against the FDIC in that or any other forum, is no violation of their constitutional rights.

### III. CONCLUSION

Because the Freemans' pleas for equitable relief are barred by 12 U.S.C. § 1821(j) and *all* their claims are barred by 12 U.S.C. § 1821(d), we do not reach the merits of their underlying claims. Assuming that the Freemans were entitled to predeprivation notice and an opportunity to be heard, they have not shown a violation of their due process rights—they had an opportunity to be heard, but declined to avail themselves of it. We therefore affirm the judgment of the district court dismissing the Freemans' claims with prejudice, on grounds that the district court was statutorily barred from hearing the claims.

*It is so ordered.*