NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | | |
|---|---|---|
| In re: | ) | BAP Nos.  NV-12-1346-KiCoD |
| | ) | NV-12-1347-KiCoD |
| COMMUNITY BANCORP, | ) | (Related appeals) |
| | ) | |
| Debtor. | ) | Bk. No.  10-20038 |
| _____ | ) | |
| WILMINGTON TRUST COMPANY; | ) | |
| HOLDCO ADVISORS, L.P., | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | **M E M O R A N D U M**[1] |
| | ) | |
| YVETTE WEINSTEIN, Chapter 7 | ) | |
| Trustee; FEDERAL DEPOSIT | ) | |
| INSURANCE CORPORATION, as | ) | |
| Receiver of Community Bank of | ) | |
| Nevada; PACIFIC COAST BANKERS | ) | |
| BANK, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Argued and Submitted on July 19, 2013,
at Las Vegas, Nevada

Filed – August 20, 2013

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Bruce A. Markell, Bankruptcy Judge, Presiding

Appearances:    Christopher Celentino, Esq. of Foley & Lardner LLP
argued for appellant, Wilmington Trust Company;
Seth B. McCormick, Esq. of Brown Legal Advisors,
LLC argued for appellant, HoldCo Advisors, L.P.;
Jeffrey Eric Schmitt, Esq. argued for appellee,
FDIC Receiver; and Elizabeth E. Stephens, Esq. of
Sullivan Hill Lewin Rez & Engel argued for
appellee, Yvette Weinstein, Chapter 7 trustee.

---

[1] This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may have
(see Fed. R. App. P. 32.1), it has no precedential value. See 9th
Cir. BAP Rule 8013-1.

Before: KIRSCHER, COLLINS[2] and DUNN, Bankruptcy Judges.

Appellants, Wilmington Trust Company, as Indenture Trustee ("Wilmington"), and HoldCo Advisors, L.P. ("Holdco"), as manager for Financials Restructuring Partners, Ltd. and Financials Restructuring Partners III, Ltd. (collectively, "Appellants"), appeal an order from the bankruptcy court approving the chapter 7[3] trustee's motion to approve a settlement with appellee, the Federal Deposit Insurance Corporation, as Receiver ("FDIC-R"), for certain tax refunds. We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

## A. The chapter 7 filing

Community Bancorp, Inc. ("Debtor" or "holding company"), a Nevada corporation, filed a chapter 7 bankruptcy case on May 28, 2010. Yvette Weinstein was appointed as trustee ("Trustee"). Immediately upon her appointment, she employed Larry L. Bertsch, a certified public accountant and former chapter 7 panel trustee ("CPA"), to assist her with the case, as well as attorneys. She also sought under Rule 2004 to examine Debtor's attorneys.

Debtor was the holding company for two failed banks — Community Bank of Nevada, a bank chartered by the State of Nevada ("CBON"), and Community Bank of Arizona, a bank chartered by the State of Arizona ("CBOA")(collectively, the "Banks"). Debtor is the parent corporation; the Banks are its subsidiaries. Prior to

---

[2] Hon. Daniel P. Collins, Bankruptcy Judge for the District of Arizona, sitting by designation.

[3] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

the petition date, the Nevada Department of Business & Industry, Financial Institutions Division, closed CBON, and the Arizona Department of Financial Institutions closed CBOA. The FDIC-R was appointed receiver, succeeding to "all rights, titles, powers, and privileges" of those institutions. See 12 U.S.C. § 1821(d)(2)(A)(I). Wilmington, as Indenture Trustee, is Debtor's largest undisputed, unsecured creditor with a claim for $50 million in bonds, which were issued by Debtor pursuant to an Indenture, and represents the individual holders of those trust preferred securities. Holdco represents a similar group of individuals holding Debtor-issued trust preferred securities.

Prior to the petition date, Debtor routinely filed consolidated tax returns on its own behalf and on behalf of its subsidiaries, including the Banks, which is a common practice amongst parent and subsidiary corporations that can provide substantial tax-saving benefits. In its Schedule B, Debtor listed potential tax refunds of approximately $27 million ("Tax Refunds"). An approximate $12 million refund was estimated for NOL (net operating loss) carrybacks from tax year 2008, and an approximate $15 million refund was estimated for NOL carrybacks from tax year 2009. In its Schedule F, Debtor listed the FDIC-R as holding two unsecured, unliquidated and disputed claims of $780,000,000 and $25,500,000; Wilmington was listed as holding an unsecured, contingent and liquidated claim for $50,000,000, which Debtor described as "Subordinate Debt." Holdco was not listed as a creditor but is affiliated with U.S. Bank, who filed a proof of claim in this case.

On August 18, 2010, the FDIC-R filed an emergency motion for

-3-

relief from stay seeking to file the necessary federal tax return on behalf of the Banks to obtain the scheduled Tax Refunds. However, before the matter was decided, on September 2, 2010, Trustee and the FDIC-R filed a stipulation agreeing to file a consolidated return on behalf of Debtor and the Banks. Trustee believed that the Tax Refunds, at least in part, belonged to Debtor and were property of the estate; the FDIC-R contended that all, or substantially all, of the Tax Refunds belonged to it and were not property of Debtor's estate. The parties agreed to disagree on the ownership issue, but, in the meantime, agreed that it was in the best interest of all parties to file the consolidated return by the September 15, 2010 deadline or lose the $27 million in Tax Refunds forever. Further, a consolidated return was expected to result in a larger refund. Any monies received were to be placed into an escrow account while ownership of the Tax Refunds was determined.

The parties' stipulation was approved, and the consolidated return resulted in a tax refund of $15,172,962.00. The remaining $12 million refund was subject to an earlier tax return filed by the FDIC-R and was still pending with the IRS.[4]

**B.    The settlement motion for the Tax Refunds**

In October 2010, Trustee filed a motion to approve settlement of the Tax Refunds ("Settlement Motion"). In support, Trustee offered a copy of the Settlement Agreement, her declaration and a declaration from her CPA. Trustee contended that she and her professionals had engaged in lengthy settlement negotiations with

---

[4] The FDIC-R has since received the remaining $12 million refund.

-4-

the FDIC-R, its tax advisors and attorneys, including discussions of the accountants' different analyses of what portions of the Tax Refunds belonged to the estate. Trustee's CPA concluded, based on prior tax returns, the "Agreement to Join in the Filing of Consolidated Federal and State Income Tax Returns" executed by Debtor and the Banks (the "TFA") prior to the bankruptcy, and the consolidated tax return, which included Debtor's losses and enhanced the refund by $3.1 million, that $3.1 million of the Tax Refunds should be allocated to the estate. Under an alternative theory, the CPA concluded that the estate should receive about $8 million of the Tax Refunds. Although the FDIC-R conceded that it could understand the CPA's $3.1 million analysis in Debtor's favor, it did not concede the validity of that analysis. The FDIC-R claimed it owned the Tax Refunds because the Banks had suffered sufficient losses over the carryback period entitling it to the entire refund.

To settle the matter, the parties agreed the estate would receive $3 million of the Tax Refunds, and the FDIC-R would receive $24 million. The FDIC-R agreed to waive any claim to the $3 million received by the estate and was responsible for any fees incurred with future IRS audits respecting the consolidated tax return. The parties were still negotiating their dispute over the estate's other major asset — its director and officer insurance policies ("D & O Policies"). Despite settling the Tax Refunds issue, the FDIC-R was not waiving any claims to the D & O Policies or any other assets Trustee recovered.

To satisfy her burden under Martin v. Kane (In re A & C Props.), 784 F.2d 1377, 1381 (9th Cir. 1986)("A & C"), Trustee

-5-

asserted that three of the four factors favored settlement. As for the probability of success in litigation, Trustee conceded that while she could recover additional portions of the Tax Refunds if she were to litigate the issue, she believed the risk factor involved in litigation indicated that the settlement was fair and reasonable and in the best interest of creditors and the estate. Because of the FDIC-R's position that the estate should receive no portion of the Tax Refunds, litigation would be necessary, which would only incur further expenses and fees. Collection was not an issue because the Tax Refunds had been received and were being held in escrow. As for the complexity of the litigation and the expense, inconvenience and delay associated with it, Trustee contended that litigation would consume much time and expense for the estate — scant case law existed, and potentially numerous witnesses, exhibits and documents would be necessary for trial, drawing out the case and adding to its expense, inconvenience to witnesses and resultant delay. The estate would also incur significant administrative expenses. Therefore, $3 million in hand was superior to expensive litigation that offered no guarantee of a favorable outcome. Finally, Trustee contended that settlement was in the paramount interest of creditors, because successful litigation was not guaranteed and could result in no benefit for the estate. Trustee also believed that creditor Pacific Coast Banker's Bank ("PCBB") would support the settlement.[5] Accordingly, contended Trustee, the settlement was fair and equitable and in the best interest of creditors.

---

[5] PCBB did file a limited objection to the Settlement Motion, but later withdrew it.

Trustee's CPA also opined that settlement was in the best interest of creditors and the estate. A hearing was set for November 22, 2010.

In support of its objection to the Settlement Motion, Holdco offered copies of various unpublished, out-of-district decisions it contended supported Debtor's rights to the Tax Refunds and a copy of the TFA. In short, Holdco opposed Trustee surrendering the most valuable asset of the estate at too much of a discount, receiving only approximately 11% of the Tax Refunds. Holdco argued that Trustee had failed to show any support for her contention that she would have a low probability of success in litigation, offering only a conclusory statement to that effect. In Holdco's opinion, Trustee's position was strong, as courts across the nation were holding that when a tax sharing agreement exists between a bank subsidiary and the bank holding company, then that agreement controls the ownership rights to the tax refund. Citing W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.), 473 F.2d 262, 265 (9th Cir. 1973), Holdco argued that while Bob Richards held that a tax refund attributable to the business losses of a subsidiary in a consolidated group is owned by the subsidiary, even though it was received by the agent parent, the Ninth Circuit further held that parties within a consolidated group were free to draft a "differing agreement" with respect to the ultimate disposition of tax refunds. Here, argued Holdco, the language of the TFA created a debtor-creditor relationship, as opposed to a principle-agent relationship, and thus Debtor as the parent holding company owned the Tax Refunds.

Second, as for the complexity, expense, inconvenience and delay associated with litigation, Holdco argued that Trustee's conclusory statements regarding the expense of litigation failed to satisfy her burden. According to Holdco, based on its involvement in similar tax refund ownership cases against the FDIC-R, the case most likely did not involve a factual inquiry beyond the controlling documents, namely, the TFA, it could be decided on summary judgment, and ample case law in Trustee's favor existed.

Finally, Holdco argued that Trustee's proposed settlement amounted to creditors receiving a $24 million haircut. Holdco contended that Trustee had failed to give any deference to the paramount interest of Debtor's unsecured creditors whose rights would be so drastically affected by it. The settlement preferred the FDIC-R's contingent, disputed claim by paying it nearly 100 cents on the dollar, while leaving the remaining creditors with crumbs.

Wilmington also objected to the Settlement Motion, asserting that Trustee had failed to establish the settlement was fair and equitable. First, the Settlement Motion did not provide adequate information about the negotiation process, or provide the legal basis for the FDIC-R's ownership claim over the Tax Refunds or Trustee's decision to settle such claims. Further, the proposed settlement was not a global settlement resolving the FDIC-R's and Trustee's competing claims to the D & O Policies or any other assets Trustee may collect. Third, it provided little benefit to creditors, giving a windfall to the FDIC-R and leaving nothing meaningful for the estate. Fourth, recent case law and the

language in the TFA supported the estate's ownership claim — it created a debtor-creditor relationship between the parties, not a trust. As a result, argued Wilmington, Bob Richards was inapplicable, the Tax Refunds were property of the estate, and the FDIC-R merely held an unsecured claim. Accordingly, in Wilmington's opinion, the potential for success in litigation seemed high, or at least high enough to give Trustee leverage to negotiate a better settlement. Finally, Wilmington argued that Trustee had failed to demonstrate that litigation with the FDIC-R would be overly complex or expensive, contending that the facts and issues were not necessarily numerous or complicated.

In its reply to the objections, the FDIC-R contended that it had reached a settlement with Trustee after fifteen months of investigation and negotiation, and that only two creditors had objected to the Settlement Motion among fifteen creditors who had filed proofs of claim — PCBB, which would likely withdraw its limited objection, and Wilmington. The FDIC-R contended that Holdco lacked standing to object.

In short, the FDIC-R argued that the settlement satisfied the "lowest point in the range of reasonableness" under Rule 9019, and that the objecting creditors' arguments relied exclusively on the TFA, which the FDIC-R contended was unenforceable under 12 U.S.C. § 1823(e) because the TFA was never approved by CBON's board of directors. Even if it were approved, argued the FDIC-R, extensive case law favored its position and many other cases involved similar 90%/10% settlement ratios in favor of the FDIC-R. The TFA at issue, in the FDIC-R's opinion, addressed only the "filing" of consolidated federal tax returns and tax payments, not the

-9-

"ownership" of refunds, so it was not the "differing agreement" exception carved out in Bob Richards.  Thus, Trustee's probability of success in litigation was low because the refunds were from taxes paid by CBON, and therefore belonged to the FDIC-R under Bob Richards.  Accordingly, argued the FDIC-R, Trustee reasonably determined that the risks, delays and expense of litigation were not justified.  Finally, the FDIC-R contended that litigation over the ownership of the Tax Refunds would be extremely complicated, time consuming and expensive, which supported approval of the Settlement Motion.  Numerous depositions and other discovery would be necessary to determine the parties' intent regarding the TFA and how the parties treated and booked tax refunds in the past.

In her reply and supporting declaration, Trustee contended that even though all parties knew about the tax refund issue over a year ago, Holdco and Wilmington never contacted her or her attorneys prior to her filing the Settlement Motion, and neither had taken any formal discovery with regard to how or why the settlement was reached.  Trustee said she was aware of the tax refund issue from the start, and that she and her professionals spent considerable time analyzing it.  Overall, she believed settlement was justified in light of the risk of litigation, and the vastly different positions articulated by the FDIC-R and the objectors only highlighted the case's complexity.  Favorable cases cited by the objecting creditors were unpublished and not Ninth Circuit cases.  In any event, the issue turned on the interpretation of the TFA, and Trustee disagreed with their position that it created a debtor-creditor relationship.  She and her CPA believed that more likely the Banks owned the Tax Refunds;

-10-

Debtor was merely holding the funds as agent. Further, because litigation could result in no benefit to the estate, Trustee argued that the settlement, which she based on the advice from her professionals and her own business judgment, was in the best interest of creditors. Attached to Trustee's reply was a copy of minutes from one of Debtor's board meetings held just prior to the bankruptcy filing. There, chairman Ed Jamison noted that Debtor was entitled to $200,000 to $2 million of the $27 million refund.

On November 21, 2011, one day prior to the hearing on the Settlement Motion, Holdco and Wilmington filed lengthy replies to the replies of the FDIC-R and Trustee. Both contended that Trustee had still not met her burden under A & C. Holdco contended that it was "exceptionally confident" that, given 45-60 days, it could submit to Trustee an offer to purchase the estate's rights to the Tax Refunds for a lump sum of cash "far in excess of the $3 million" Trustee would receive under the settlement.

The bankruptcy court held a hearing on the Settlement Motion on November 22, 2011. Because the objecting creditors had not been given a copy of the most recent TFA from 2007, which Trustee's counsel argued was identical to the 2003 version they had been provided, the court denied the Settlement Motion without prejudice so that creditors could have an opportunity to review the 2007 TFA, a document it considered to be "essential and critical" to the issue.

**C.** **Wilmington's motion to compel mediation and motion to prosecute**

On February 27, 2012, Wilmington filed a motion to compel mediation, contending that it had been trying since November 2011

-11-

to facilitate settlement discussions regarding the Tax Refunds and the D & O Policies with Trustee, to no avail. It now sought a court-imposed mediation in hopes that a better settlement could be reached amongst the parties. A hearing was set for March 27, 2012.

Trustee and the FDIC-R opposed the motion. The FDIC-R noted that three months had passed since Wilmington received a copy of the 2007 TFA, yet it had still not conducted any of the discovery it requested or claimed was necessary before the court considered the settlement. Trustee confirmed this contention, and further noted that Holdco had yet to make an offer to purchase the estate's rights and/or claims to the Tax Refunds as promised, which Trustee would "seriously" consider. Trustee believed that mediation would not be beneficial. Trustee further believed the motion was premature and should be considered only after she filed her renewed settlement motion, which she was filing momentarily.

Wilmington then moved for an order authorizing it to prosecute an adversary proceeding against the FDIC-R to determine ownership of the Tax Refunds. A hearing was set for April 24, 2012.

**D.    Trustee's renewed settlement motion**

Trustee filed her renewed motion to approve settlement of the Tax Refunds on March 14, 2012 ("Renewed Settlement Motion"). In support, she offered her declaration and a declaration from her CPA. The terms were the same, but Trustee provided more information about how the settlement was reached. Trustee reiterated that she knew of the tax refund issue once she was assigned to the case, and that after analyzing the relevant case

-12-

law, it became clear to her that this was an unsettled and complex issue. Although the objecting creditors had taken a contrary position, Trustee still believed that the FDIC-R had the better case for ownership of the Tax Refunds. The differences in the parties' positions indicated that litigation posed a substantial risk; she could end up with zero recovery. Trustee further noted that even Debtor's chairman had concluded Debtor was entitled to only $200,000 to $2 million of the Tax Refunds. Accordingly, upon the advice of her professionals and her own business judgment, Trustee believed that the settlement was fair and in the best interest of creditors. The FDIC-R filed its brief in support of the Renewed Settlement Motion on March 14, 2012. The Renewed Settlement Motion was set for hearing on April 24, 2012.

On March 27, 2012, the bankruptcy court held a hearing on Wilmington's motion to compel mediation. On the court's own motion, it continued the hearing on that motion, along with Wilmington's motion to prosecute and Trustee's Renewed Settlement Motion, so it could hear all three matters concurrently. All three motions were continued to April 24, 2012, and again to June 12, 2012.

**E.    Supplemental briefing on the Renewed Settlement Motion and the continued hearing**

The FDIC-R filed its supplemental brief in support of the Renewed Settlement Motion, contending that certain recent developments further supported settlement. Despite Holdco's offer to buy the claim within 45-60 days for more than $3 million, after four months Holdco had proposed only a contingency arrangement with Trustee that guaranteed no money to the estate, which Trustee

-13-

rejected. Wilmington had made a similar offer, also rejected by Trustee. Next, the law firm representing Holdco had recently represented a chapter 7 Trustee and successfully obtained approval of a tax refund settlement with the FDIC that split the refund 90% to the FDIC and 10% to the trustee. In re Tamalpais Bank, case no. 10-13707, dkt. no. 70 (Bankr. N.D. Cal. Apr. 13, 2012) (settlement approved where trustee received $950,000 of a $10.35 million tax refund, with the FDIC getting the remainder). Third, the FDIC-R had now filed its proof of claim for approximately $47 million.[6] Finally, the FDIC-R asserted, for the first time, that Wilmington and Holdco's opposition should be given less weight because their claims were subordinate to the claims of the FDIC-R and PCBB and unlikely to receive a distribution from the estate, even if Debtor were adjudicated owner of the Tax Refunds.

Trustee filed her supplemental brief and declarations in support of the Renewed Settlement Motion on May 11, 2012, which attempted to "beef up" her prior pleadings. As for the probability of success in litigation, Trustee asserted several reasons why settlement was preferable to litigation. First, she argued that the TFA did not determine "ownership" of the Tax Refunds, and the record reflected that the Banks suffered sufficient losses entitling them to the entire refund. Therefore, under Bob Richards, the FDIC-R likely owned the Tax Refunds. Trustee was further persuaded by additional facts for why the Banks were entitled to the Tax Refunds including, inter alia, the

---

[6] This was far less than the approximate $800 million Debtor had listed owing the FDIC-R in its Schedule F.

-14-

Banks had carried the refunds on their books and Debtor had not, and Debtor's corporate minutes provided that the refunds were owned by the Banks. Therefore, in Trustee's opinion, the FDIC-R would more likely prevail on this issue if litigated. Further, Trustee contended that, in her best business judgment, settlement was preferable to the risk and uncertainty of litigation; a $3 million "bird in the hand" was superior to wading "into the murky waters of what [was] at best an evolving area of the law." It was clear to her that the FDIC-R would vigorously contest the estate's claims of ownership, and she predicted that litigation would take approximately two to three years, including an inevitable appeal, which would burden the estate with substantial legal fees and no guarantee of success. Finally, Trustee contended that the settlement was reasonable, appropriate under the circumstances, and in the best interest of the estate and the creditor body as a whole. She agreed with the FDIC-R that Wilmington and Holdco were likely "far out of the money" with their subordinated claims and that their arguments should be given minimal weight. Trustee asserted that she had always assumed these two creditors held subordinated claims, which perhaps explained why they were not involved in the case until after she filed the Settlement Motion. Nonetheless, to take their position and gamble with other people's money was unfair and not a proper exercise of her business judgment.

In its supplemental objection to the Renewed Settlement Motion, Holdco contended that the settlement still failed to satisfy A & C and was not fair and equitable to creditors. Holdco disputed the FDIC-R's and Trustee's latest position that its claim

-15-

was subordinated and out of the money. Holdco argued that for Trustee to take this position only showed her ignorance of the nature of its claims and exposed that she was proceeding with a settlement without knowing all of the facts and circumstances. Finally, Holdco noted a recent decision, Siegel v. FDIC (In re Indymac Bancorp, Inc.), 2012 WL 1037481 (Bankr. C.D. Cal. Mar. 29, 2012), another case it contended favored Trustee, in which Judge Bluebond rejected each of the arguments the FDIC-R had asserted here and determined that the tax refunds at issue were property of the estate. Attached to Holdco's brief was a copy of the Indymac decision, a tentative ruling from the Southern District of California, In re Imperial Capital Bancorp, Inc. (09-19431), and the Indenture agreement dated September 21, 2006.

Wilmington filed its supplemental objection to the Renewed Settlement Motion, reiterating its prior arguments and contending that the proposed settlement still did not satisfy A & C. Wilmington argued that Trustee had failed to offer any factual or legal basis for her conclusory statements that the TFA did not create a debtor-creditor relationship, and that Debtor was holding the Tax Refunds as "agent" for the Banks. Wilmington also speculated that because Trustee was not settling the issue of the D & O Policies, she could end up depleting the $3 million she would receive from the settlement litigating that unresolved issue with the FDIC-R. Wilmington disputed that its claim was subordinated and out of the money. In a separate response to the FDIC-R's supplemental brief in support of the Renewed Settlement Motion, Wilmington provided a more detailed analysis as to why its claim was not subordinate to, but rather was in pari passu with,

-16-

the FDIC-R's.

Trustee filed a reply brief and declaration in support of the Renewed Settlement Motion on June 5, 2012. She had assumed the claims of Wilmington and Holdco were subordinated from the beginning of the case, particularly in light of their silence, which is why she focused more on the FDIC-R and PCBB, the active creditors in the case. However, she now conceded that perhaps they may not be subordinated. In any event, argued Trustee, while the objecting creditors were lamenting that the estate's claim to the Tax Refunds was worth more than what Trustee was receiving, neither of them had offered to buy the claim or guarantee the estate a recovery, which implied that maybe the issue of the estate's ownership of the Tax Refunds was not such a "slam dunk" as they had argued. The recent Imperial and Indymac cases, which Trustee noted were unpublished and not binding, only represented yet more examples of the shifting and uncertain legal landscape on which she had to make decisions here. Regarding her conclusion on the TFA, Trustee determined that the parties had not made a "differing agreement" as to "ownership" of the Tax Refunds, so Bob Richards controlled, and the language of the TFA favored the FDIC-R. Wilmington and Holdco were wrong in asserting that Bob Richards did not apply if any tax agreement existed between the parties, even if it was silent as to ownership of tax refunds.

The FDIC-R filed a reply to the supplemental objections to the Renewed Settlement Motion on June 5, 2012, to which Trustee filed a response on June 6, 2012. In short, Trustee argued that the settlement was a reasonable exercise of her business judgment. Each party had vigorously advocated its position describing

-17-

different but reasonable outcomes, but each depended heavily on factual and legal determinations not yet made in this case, that would only be made after years of litigation effort and expense. The parties' briefs clearly showed that reasonable minds could differ and only illustrated the shifting and uncertain backdrop against which she negotiated the Settlement Agreement.

Holdco filed a second supplemental objection to the Renewed Settlement Motion and offered a copy of the district court's recent decision in Indymac, which adopted Judge Bluebond's proposed findings and conclusions. Holdco argued that this further demonstrated Trustee's high probability of success in litigation over the ownership of the Tax Refunds, and that handing over 90% of the Tax Refunds to the FDIC-R was not reasonable or a fair and equitable settlement. Holdco further opposed the settlement as unreasonable because Trustee had now admitted that she failed to conclude on her own that Holdco's claim was subordinate to the FDIC-R's; she had merely accepted the FDIC-R's wrongful assertion.

The FDIC-R filed a response to Holdco's second supplemental objection on June 11, 2012, still contesting Holdco's standing and ability to object to the settlement.[7]

**F. The bankruptcy court's decision to approve the Renewed Settlement Motion**

The bankruptcy court held a hearing on the Renewed Settlement

---

[7] Appellees also contest Holdco's standing in its appeal. However, Wilmington, whose standing appellees do not contest, has also appealed the Settlement Order and has raised essentially the same arguments as Holdco. Therefore, we do not reach the issue of Holdco's standing.

-18-

Motion on June 12, 2012. Counsel for the FDIC-R began by noting that no settlements of this nature involving the FDIC-R had been denied despite the "modern trend" in the case law, to which the court responded:

> But that has less to do, much less to do, with the nature of the legal issues involved and much more to do with the nature of the standard for approval of a settlement. I mean, the trustee comes in with incredible deference due to her with respect to these matters, and it's difficult. . . .
>
> It's very difficult to prove because that's the issue on a 9019 motion that she didn't follow her discretion. . . . [B]ut the question is whether or not those typical standards have been met here.
>
> It has very little in one sense to do — I mean, once you decide that the state of the law is not uniform, you basically have to move on.
>
> I mean, you can argue the individual points, but to argue them only kind of reinforces the point that she's exercising her discretion appropriately in an area in which there is no one true answer.
>
> So I'm not real sure that it makes a lot of sense or we gain a lot by arguing who's right and who's wrong about Bob Richards. The fact that we're having the argument at all is a point in favor of the trustee.

Hr'g Tr. (June 12, 2012) 16:20-25; 17:3-17. Counsel for Holdco and Wilmington then presented their arguments. Holdco argued that Trustee had entered into a settlement without knowing all of the facts and had simply accepted without challenge the FDIC-R's self-serving versions of them, which prompted the following colloquy:

> THE COURT: I mean, how do you know that? Did anyone take the trustee's deposition?
>
> COUNSEL: No, your Honor.
>
> THE COURT: I mean --- all we know is what she has provided by the way of multiple declarations, correct?
>
> COUNSEL: Yes, your Honor. Well, and in the pleadings

-19-

> itself, the trustee defers to the FDIC's subordination arguments as opposed to raising it itself [sic].
>
> THE COURT: Well, I mean, I do the same thing. For example, if I were to do what you suggest, I would rely on Judge Nakagawa's reasoning, not my own, and that's the same thing. I'm just incorporating someone else's reasoning. That's not necessarily nefarious.

Id. at 49:9-23. Upon counsel's argument that Bob Richards "has been struck down as being controlling in a number of cases" the court stated:

> THE COURT: Well, no. I mean, it's still controlling because it's still Ninth Circuit. What they (other recent cases) find is that the prepetition contractual arrangements take it outside of the general equitable holding that the person who generated the losses that led to the refund should get the refund.
>
> COUNSEL: Yes, your Honor.

Id. at 50:16-24. After hearing further argument from the parties, the bankruptcy court entered its oral ruling approving the Renewed Settlement Motion. In applying the A & C factors, the court determined that the settlement was fair, equitable and reasonable.

The bankruptcy court entered an order approving the Renewed Settlement Motion on June 20, 2012 ("Settlement Order"). The motion to compel mediation and motion to prosecute were denied as moot. Both Wilmington and Holdco timely appealed the Settlement Order. Neither Appellant sought a stay of the challenged order during the pendency of this appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158, subject to the jurisdictional issue below.

-20-

# III. ISSUES

Are these appeals moot? If not, did the bankruptcy court abuse its discretion in entering the Settlement Order?

## IV. STANDARDS OF REVIEW

We review de novo issues of mootness. Foster v. Carson, 347 F.3d 742, 745 (9th Cir. 2004).

We review the bankruptcy court's decision to approve a settlement for an abuse of discretion. In re A & C Props., 784 F.2d at 1380. The court abuses its discretion if it applied the wrong legal standard or its findings were illogical, implausible or without support in the record. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

Because the bankruptcy court identified and applied the correct legal standard, the only question left on appeal is whether its determinations that the settlement was fair and equitable and in the best interest of the estate were clearly erroneous. To that end, we note that "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985)(citations omitted). We may affirm on any ground supported by the record. Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

///

///

///

**V. DISCUSSION**

**A.    The appeals may be moot.**

**1.    Parties' contentions**

The FDIC-R moved to dismiss these appeals as constitutionally and equitably moot.  Trustee joined in that motion.  Wilmington opposed it.

In a January 2, 2013 order, the motions panel denied the motion to dismiss without prejudice, leaving the matter for the merits panel to consider, and ordered supplemental briefing on the following two issues: (1) explaining exactly how the FDIC-R works, what its assets are; and (2) explaining how much money the FDIC-R paid to the FDIC and whether that was reimbursement for money the FDIC had already paid out on insured funds.

In its supplemental brief, the FDIC-R explained how it and the FDIC in its corporate capacity ("FDIC-C") are separate legal entities having separate functions.  Specifically, the FDIC is a corporation that carries out its statutory duties in two distinct capacities: in its corporate capacity and in its capacity as receiver for a failed depository institution.  Much like Title 11, Title 12 provides a priority payment scheme for the payment of claims made against the FDIC-R.  The FDIC-R is obligated to pay all valid claims against the insured depository institution in accordance with the limitations of the FDI Act.  The FDIC-C's subrogated claim against the FDIC-R, which the FDIC-C obtained once it made insurance payments to CBON's depositors upon that bank's failure, had second priority of payment, junior only to the FDIC-R's administrative expenses.

The FDIC-R explained that it had distributed the $24 million

-22-

it received in settlement proceeds by declaring and paying a 4% distribution from its cash balance to the FDIC-C and the seventy-seven depositors on November 1, 2012. The money paid consisted of funds generated from the liquidation of CBON's assets, the FDIC-R's portion of the settlement proceeds, and other miscellaneous receipts. From this distribution, the FDIC-C received $56,118,542.96, and the seventy-seven depositors collectively received $189,999.62. The FDIC-R asserted that this distribution represented a comprehensive change in circumstances that would be extremely difficult and inequitable to unwind.

As for its assets, the FDIC-R claimed that it held $383,560,000 in assets and $991,768,000 in liabilities, which included the FDIC-C's subrogated claim of $980,306,536 and seventy-seven uninsured depositors' claims collectively totaling $3,320,353. Nonetheless, the FDIC-R asserted that the Panel lacked jurisdiction under 12 U.S.C. § 1821(d)(13)(D)[8] to order it to pay back the settlement funds to Debtor's estate.

Wilmington contended that the FDIC had not paid "third parties," but rather paid itself with more than 99.7% of the settlement funds received. As both transferee and transferor of the distribution, argued Wilmington, the FDIC had full knowledge

---

[8] Title 12 U.S.C. § 1821(d)(13)(D) provides:

Except as otherwise provided in this subsection, no court shall have jurisdiction over —
  (I) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
  (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

of the appeal and the potential for a disgorgement or repayment order. As such, it could not contrive self-serving facts to achieve the equitable protection of the mootness doctrine. In short, argued Wilmington, regardless of who the FDIC paid, because the FDIC is a party to the appeal and the court could fashion effective relief through a disgorgement order, mootness did not apply. Wilmington further argued that the FDIC-R held sufficient cash and other investments, giving it the ability to repay the $24 million to Debtor's estate.

**2. Analysis**

As the party advocating mootness, the FDIC-R bears a heavy burden of establishing that we cannot provide any effective relief to Appellants. United States v. Gould (In re Gould), 401 B.R. 415, 421 (9th Cir. BAP 2009), aff'd on other grounds, Gould v. United States, 603 F.3d 1100 (9th Cir. 2010), cert. denied, 131 S.Ct. 557 (2010)(citing Suter v. Goedert, 504 F.3d 982, 986 (9th Cir. 2007)).

Constitutional mootness is derived from Article III of the U.S. Constitution, which provides that the exercise of judicial power depends on the existence of a case or controversy. DeFunis v. Odegaard, 416 U.S. 312, 316 (1974); Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC), 391 B.R. 25, 33 (9th Cir. BAP 2008). The mootness doctrine applies when events occur during the pendency of the appeal that make it impossible for the appellate court to grant effective relief. Id. The determining issue is "whether there exists a 'present controversy as to which effective relief can be granted.'" Vill. of Gambell v. Babbitt, 999 F.2d 403, 406 (9th Cir. 1993)(quoting Nw. Envtl. v. Gordon, 849 F.2d

-24-

1241, 1244 (9th Cir. 1988)). If no effective relief is possible, we must dismiss for lack of jurisdiction. United States v. Arkison (In re Cascade Rds., Inc.), 34 F.3d 756, 759 (9th Cir. 1994).

We conclude that these appeals are not constitutionally moot because it is possible to grant relief to Appellants by reversing or modifying the Settlement Order and ordering the FDIC-R to disgorge its portion of the settlement proceeds. Although the FDIC-R has distributed the $24 million proceeds to the FDIC-C and seventy-seven depositors, the FDIC-R has sufficient assets to satisfy a disgorgement order were one issued, whether or not we agree that the FDIC-C is a separate legal entity and not a party to this appeal. We are not persuaded by the FDIC-R's argument that we are deprived of jurisdiction to order disgorgement of the settlement funds under 12 U.S.C. § 1821(d)(13)(D). That statute divests courts of subject matter jurisdiction over claims presented to the FDIC until the claimant has exhausted all administrative remedies. Henderson v. Bank of New Eng., 986 F.2d 319, 320-21 (9th Cir.), cert. denied, 510 U.S. 995 (1993); Freeman v. FDIC, 56 F.3d 1394, 1398-1400 (D.C. Cir. 1995). We fail to see how that statute is applicable here.

Equitable mootness, on the other hand, is not so clear. It applies when an appellant has "'failed and neglected diligently to pursue their available remedies to obtain a stay'" and changes in circumstances "'render it inequitable to consider the merits of the appeal.'" Darby v. Zimmerman (In re Popp), 323 B.R. 260, 271 (9th Cir. BAP 2005)(quoting Focus Media, Inc. v. Nat'l Broad. Co. (In re Focus Media, Inc.), 378 F.3d 916, 923 (9th Cir. 2004)).

-25-

See also Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.), 677 F.3d 869, 880 (9th Cir. 2012). For a case to be equitably moot, "[t]he question is whether the case 'presents transactions that are so complex or difficult to unwind that the doctrine of equitable mootness would apply.'" Id. (quoting Lowenschuss v. Selnick (In re Lowenschuss), 170 F.3d 923, 933 (9th Cir. 1999)). "Ultimately, the decision whether or not to unscramble the eggs turns on what is practical and equitable." Baker & Drake, Inc. v. Public Serv. Comm'n of Nev. (In re Baker & Drake, Inc.), 35 F.3d 1348, 1352 (citations omitted).

It is undisputed that Appellants did not seek a stay of the Settlement Order. In Platinum Capital Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.), 314 F.3d 1070, 1074 (9th Cir. 2002), the Ninth Circuit held that even if debtor's plan had been substantially consummated, the creditor's appeal was not equitably moot for failing to seek a stay because its claim was strictly for monetary damages and debtor was solvent. However, more recently in In re Thorpe Insulation Co., the Ninth Circuit implemented a two-step process for determining whether an appeal is equitably moot:

> We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. If a stay was sought and not gained, we then will look to whether substantial consummation of the plan has occurred. Next, we will look to the effect a remedy may have on third parties not before the court. Finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

677 F.3d at 881. Thus, Thorpe implies that if a party fails to seek a stay of the challenged order or judgment on appeal, then

-26-

the court does not even get to step two. In other words, failure to seek a stay may alone be enough to render these appeals equitably moot. See also Stokes v. Gardner, 2012 WL 1944552, at *1 (9th Cir. May 30, 2012)(citing Thorpe and holding that failure to seek a stay may, "by itself," render a party's claim equitably moot).

Clearly, an inconsistency exists between Sylmar and Thorpe, and, one that could determine the ultimate outcome here. However, without addressing this inconsistency and deciding whether these appeals are equitably moot, we instead turn to the merits.

**B.    The bankruptcy court did not abuse its discretion when it approved the Renewed Settlement Motion.**

The impetus for this appeal originates in Appellants' clear dissatisfaction with the amount Trustee received from the Tax Refunds. They believe $3 million is too low, based on their interpretation of the TFA and how trustees in similarly situated cases have faired in bankruptcy courts across the country as of late. Based on the record before us, however, we conclude that the bankruptcy court properly exercised its discretion in approving the settlement.

**1.    Governing law**

Rule 9019(a) authorizes the bankruptcy court to approve a settlement on motion by the trustee and after notice and a hearing. As the party proposing the compromise, the trustee bears the burden in proving that the settlement is fair and equitable and should be approved. In re A & C Props., 784 F.2d at 1382.

The bankruptcy court must conduct an inquiry into all "factors relevant to a full and fair assessment of the wisdom of

-27-

the proposed compromise." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968). That is, the bankruptcy court must find that the settlement is fair and equitable in order to approve it. In re A & C Props., 784 F.2d at 1381. In conducting this inquiry, the bankruptcy court must consider the following factors: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. Id.

The bankruptcy court has considerable discretion in evaluating a proposed settlement because it "is uniquely situated to consider the equities and reasonableness [of it] . . . ." United States v. Alaska Nat'l Bank (In re Walsh Constr., Inc.), 669 F.2d 1325, 1328 (9th Cir. 1982). "[A]s long as the bankruptcy court amply considered the various factors that determined the reasonableness of the compromise, the court's decision must be affirmed." In re A & C Props., 784 F.2d at 1381.

**2. Appellants' contentions**

Wilmington complains, generally, that the bankruptcy court failed to set forth adequate findings to support approval of the settlement. Wilmington further argues that the record does not contain facts to support the bankruptcy court's decision to approve the settlement. Finally, Wilmington argues that the bankruptcy court abused its discretion by approving a settlement that was not fair and equitable or in the best interest of the

-28-

estate and creditors. Holdco asserts similar arguments. We address the parties' arguments in turn.

### 3. Analysis

#### a. Probability of success in litigation

The bankruptcy court found that the probability of Trustee's success in litigation was uncertain, and therefore this factor favored settlement:

> What I have before me are several declarations which have been argued at length of the trustee and of the trustee's CPA, various other documents as has been mentioned, over 1,000 pages of various documents.
>
> And to go through these factors . . . the probability of success in litigation . . . one sparrow does not a spring make. One case or one series of cases does not absolute precedent make.
>
> From my understanding and my reading and my research, the issues that are involved here with respect to the ability to monetize and to collect a tax refund in this circumstance is both fact dependent. But even if all of the facts were agreed upon, the law is certainly in flux.
>
> I'll grant the trend may be in favor of holding companies versus FDIC, but, again, trends don't make the type of decisions that would make a trustee's decision improper. Rather, it's simply the background against which this trustee has to assess it, and, you know, trustees can even settle things for which they think there's a probability of success.

Hr'g Tr. (June 12, 2012) 60:3-23.

Contrary to Appellants' contentions, we conclude that the bankruptcy court set forth sufficient findings for this factor and that the record contained facts to support such findings. Trustee stated in her supplemental declarations of March 14, May 11 and June 5, (1) she was aware of the tax refund issue from the start of the case, (2) that the case law on this issue was unsettled, (3) that the TFA did not determine for certain whether Debtor owned the Tax Refunds as the objecting creditors had

-29-

asserted, (4) that the FDIC-R would likely prevail under Bob Richards, (5) that the Banks had suffered sufficient losses entitling them to the refunds, and (6) that the parties' vastly different positions on the issue only illustrated the shifting and uncertain backdrop against which she negotiated the settlement. She also noted that Appellants never made her any better offers as promised. Therefore, based upon her business judgment, Trustee determined that settlement was favored over the risk and uncertainty of litigation.

The bankruptcy court considered Trustee's declarations and conducted its own reading and research on the matter at hand. In deferring to Trustee's business judgment, the court noted that case law on this issue was not settled, that this case was factually dependent, not turning only on the TFA but also other facts, and that it would not be improper for a trustee to consider these things when deciding that settlement may be the better option. The court further noted at the hearing that the parties' extensive and contrary arguments only reinforced "the point that [Trustee was] exercising her discretion appropriately in an area in which there is no one true answer." The court also found that Trustee was aware of and had considered the tax refund issue prior to entering into the settlement, and that she had involved not only the FDIC-R and its professionals in those negotiations, but also her CPA and attorneys.

We reject Wilmington's argument that the bankruptcy court erred in deferring to Trustee's business judgment because she entered into the settlement before conducting her own diligent investigation about the relevant issues, and because she had

-30-

merely accepted the FDIC-R's position as to ownership of the refunds, ignoring or not investigating the cases ruling in favor of debtor holding companies. First, as the bankruptcy court elicited from Appellants, no one had deposed Trustee to establish her alleged lack of diligence. Second, Trustee's declaratory testimony was to the contrary. Finally, even if she agreed with and adopted the FDIC-R's position or reasoning as to ownership of the Tax Refunds, we agree with the bankruptcy court that this was not necessarily nefarious.

We also reject Appellants' argument that the bankruptcy court erred by not analyzing the terms of the TFA and recent case law when ruling on the estate's probability of success in litigation. In other words, Appellants wanted the bankruptcy court to determine that their interpretation of the TFA prevailed over that of Trustee's and that Debtor was entitled to the Tax Refunds. The bankruptcy court is not required to conduct such an analysis when reviewing a settlement under Rule 9019. When assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather need only canvass the issues. Burton v. Ulrich (In re Schmitt), 215 B.R. 417, 423 (9th Cir. BAP 1997). As the bankruptcy court correctly noted, a mini-trial on the merits is not required. Id. See also In re Walsh Constr., Inc., 669 F.2d at 1328 (in approving a compromise agreement, "[t]he bankruptcy court need not conduct an exhaustive investigation into the validity of the asserted claim"); In re Hydronic Enter., Inc., 58 B.R. 363, 366 (Bankr. D.R.I. 1986)(rather than conducting a detailed evaluation of the underlying merits, the bankruptcy court's function is "to examine the proposed settlement to

-31-

determine if it falls below the lowest point in the range of reasonableness."). Nonetheless, it appears the bankruptcy court did consider the TFA to an extent, as evidenced by its statement: "I'm aware of the fact that although each side is convinced that it's right, and its precedence [sic] are clear and unwavering, I'm also convinced that each side is reading entirely different pieces of paper." Hr'g Tr. at 61:6-9.

Appellants also take issue with the bankruptcy court's finding that the range of recovery for Trustee was from $0 to $27 million, contending that the CPA's testimony established Debtor was entitled to at least $3.1 million. The CPA determined that because Debtor's losses included in the consolidated tax return resulted in a $3.1 million increase in the refund, the estate was entitled to at least $3.1 million. He also determined that the estate may be entitled to $8 million. The FDIC-R acknowledged the CPA's theory but did not accept it. Trustee opined that if she pursued litigation the estate could end up with nothing. On this issue, the bankruptcy court stated:

> [Trustee] looked at and negotiated with the FDIC over their claim. She looked to and had involved in those negotiations not only her CPA, but her lawyers.
>
> It is a fair inference although an inference based on the declarations, but a fair inference that much if not all of the issues that we have discussed and have been briefed today were on the mind at the time.
>
> Ultimately, the A & C Properties factors comes down to whether or not the settlement is within the range of reasonableness, and I hold that it is.
>
> I think, actually, the range here is not 8- to 27,000,000. It's not 3- to 8,000,000. I think it's zero to 27,000,000. The trustee clearly states in the declaration that it's possible to get zero. They have 3,000,000 in hand. . . .

-32-

> One could endlessly pick at the decisions made by the trustee as to why 3 and not 3.1, why not 3.5. Well, that's just the type of analysis I think that A & C and 9019 are intended to deflect in the sense that a settlement and compromise under 9019 is not a mini-trial in the sense that we're trying to flesh out and decide all the issues.
>
> It's, rather, the trustee asking the Court to find that a settlement that she has negotiated is within the range of reasonableness as shaped by the A & C Properties factors.

Hr'g Tr. at 64:1-14, 16-24.

In Trustee's declaration dated March 14, 2012, she stated that she relied on her CPA's belief that the estate could recover nothing if she litigated the ownership issue against the FDIC-R. The CPA stated the same in his March 14 declaration. Although Mr. Bertsch is a CPA, he is also a former chapter 7 trustee. Regardless, it was not improper for Trustee to rely on his professional opinion. With this evidence before it, we cannot conclude the bankruptcy court clearly erred in deciding that the recovery range was from $0 to $27 million.

### b. The difficulties of collection

The bankruptcy court agreed with the parties that no difficulties existed in the matter of collection, so this factor disfavored settlement. This finding is not disputed.

### c. The complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it

The bankruptcy court found that litigation was certain and would be complex. Therefore, this factor also favored settlement:

> . . . I think it would be complex litigation.
>
> . . . I have more than one bank-holding company case. I'm aware of the fact that although each side is convinced that it's right, and its [precedents] are clear

-33-

and unwavering, I'm also convinced that each side is reading entirely different pieces of paper.

There is always good advocacy involved here. But when, in fact, it's pared down, there's going to be a lot of significant fighting, and I factor out and don't consider the subordination issue.

. . . .

But the basic issue in terms of the ownership and enjoyment of the tax refund would be - although it does come down to a tax-filing agreement in many respects, there are also many other factors that would be involved.

And I think the 1,000 pages at least up to now indicates that these parties would, in fact, litigate it, and I think that that is something that the trustee could take into account very easily in terms of adopting a position that would take a settlement now.

Hr'g Tr. at 61:3-4, 5-13, 17-25.

We conclude that the bankruptcy court articulated sufficient findings for this factor and that the record supports its findings. Trustee opined that litigation over ownership of the Tax Refunds was inevitable and would consume much time and expense for the estate, because of the scant case law on the matter and the potential need for numerous witnesses, exhibits and documents for trial. She further predicted that litigating the matter would take two to three years, including the inevitable appeal, which would burden the estate with substantial legal fees and no guarantee of success.

The bankruptcy court found that litigation was inevitable and would be complex, involving a significant amount of fighting between the parties. This is certainly a reasonable inference, considering that settling this matter took three hearings, multiple motions, dozens of pleadings, and over one thousand pages of documents. And, here we are with the appeal. Although Appellants had argued that the matter could be decided on summary

-34-

judgment, the bankruptcy court apparently disagreed. While acknowledging that the TFA was a key factor, the court found that many other factors would be involved. Granted, the court did not provide a laundry list of what these factors were, about which Appellants complain, but, as noted above, Trustee set forth what factors she thought would be at issue. As such, the record supports the bankruptcy court's finding.

Wilmington contends that the bankruptcy court erred by not considering its offer to prosecute the ownership claim on a contingency fee basis when analyzing this factor. True, the bankruptcy court did not articulate anything on the record about Wilmington's offer. However, Trustee did, noting that neither Appellant had made her an offer any better than the $3 million offered by the FDIC-R. It would be a reasonable inference that the bankruptcy court did not mention or consider Wilmington's offer because it was not worth considering or mentioning. Wilmington's offer could have placed the estate in a worse position, ultimately recovering nothing.

### d. The paramount interest of the creditors and a proper deference to their reasonable views in the premises

Finally, the bankruptcy court found that the settlement was in the paramount interest of creditors and that Trustee had given proper deference to their views:

Based on my view of the record, I think the trustee has been continually educated in this process, but, certainly, at the time of the entry into the settlement agreement in October knew about the other creditors, may not have known as much as she knows now.

I'm not even sure the creditors themselves know as much then as they do now about their own claims, but the point being is that she had enough knowledge of the creditor

-35-

body to give proper deference to their reasonable views.

Much has been made from the fact that they were never contacted. I think there's been a lot of communication since then which has justified what she has done.
. . . .

A lot has been made about the trustee's business judgment in terms of adopting the settlement. And, in particular, I look at her declaration of March 14th supplemented by the May 11th.

And, again, looking into what she knew at the time she entered into this, I think there is some deference due to her judgment.

Her declaration never says she exercises her business judgment. She simply says it's a fair settlement, and it's good for the estate. I think that that determination is due deference.

Hr'g Tr. at 62:5-17; 63:6-16.

We conclude that the bankruptcy court set forth sufficient findings for this factor and that the record supports its findings. Trustee believed that settlement was in the paramount interest of creditors, because successful litigation was not guaranteed and could result in no benefit to the estate. She opined that the settlement was reasonable, appropriate under the circumstances, and in the best interest of the estate and the creditor body as a whole. PCBB, the only other creditor to surface, also supported the settlement.

The bankruptcy court, factoring out the subordination issue, found that Trustee was cognizant of the creditor body from the start, but that she had gained further knowledge about them over the course of the case to give proper deference to their reasonable views. Moreover, any initial lack of communication between her and Appellants had been cured during the settlement approval process.

-36-

Holdco argues that the bankruptcy court failed to give proper deference to the views of the objecting creditors because it simply assumed that their claims were subordinated. Wilmington makes a similar argument. Although the court did comment that "people who are out of the money want to take larger risks to recover" (Hr'g Tr. at 62:24-25), a fair reading of the record indicates that the court never made any such assumption. In fact, the court explicitly stated that it was factoring out and not considering the subordination issue.[9] Further, while creditors' objections to a compromise must be afforded due deference, such objections are not controlling. In re A & C Props., 784 F.2d at 1382.

Although the settlement may be at the low end of the spectrum, in reviewing each of the factors examined by the bankruptcy court, we conclude that it did not clearly err in this regard. The court made sufficient factual findings to support its conclusion that the Settlement Agreement was fair, equitable, within the range of reasonableness and should be approved.[10]

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM.

---

[9] We note that Debtor's Schedule F identified Wilmington's claim as a "Subordinate Debt." Thus, even if the court had made such an assumption, it (and Trustee and the FDIC-R) may not have been wrong.

[10] Although not raised by the parties, we make two further observations supporting the bankruptcy court's decision to approve the settlement. The FDIC-R had agreed to bear the risk of future audits regarding the $12 million tax refund pending with the IRS, potentially not receiving any of it, while Trustee received $3 million for the estate without risk. Further, if Debtor's board of directors had not in fact approved the TFA's, but were required to do so to be enforceable, then Bob Richards would apply and Trustee's legal position would have faced serious challenge.