Filed 12/29/15  First-Citizens Bank & Trust v. North County Church of Christ CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| FIRST-CITIZENS BANK & TRUST COMPANY,<br><br>　　Plaintiff, Cross-defendant and Appellant<br><br>　　v.<br><br>NORTH COUNTY CHURCH OF CHRIST,<br><br>　　Defendant, Cross-complainant and Appellant. | D065167<br><br><br><br>(Super. Ct. No. 37-2012-00050771-CU-OR-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas III, Judge.  Reversed.

Anderson Hilbert & Parker, John Forest Hilbert, Jeffrey N. Garland and Whitney R. Blackhurst; Garrett & Tully, Ryan Christopher Squire and Zi Chao Lin, for Plaintiff and Appellant First-Citizens Bank & Trust Company.

Schwartz Semerdjian Ballard & Cauley, James Ballard and Kevin T. Cauley; Schwartz Semerdjian Cauley & Moot and Kevin T. Cauley; Higgs, Fletcher & Mack, John Morris and Victoria Fuller, for Defendant and Appellant North County Church of Christ.

First-Citizens Bank & Trust Company (First-Citizens) sued North County Church of Christ (Church), seeking to establish the validity of a deed of trust on the Church's property securing a loan issued by Temecula Valley Bank (TVB). First-Citizens purchased the secured loan from the Federal Deposit Insurance Corporation (FDIC) after the FDIC was appointed receiver for TVB. The Church filed a cross-complaint against First-Citizens, seeking equitable relief that the deed of trust is not valid and is void as a matter of law.

After a six-day bench trial, the court rejected First-Citizens' arguments that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) precluded the court from assuming jurisdiction over the Church's claims and defenses. (12 U.S.C. § 1811, et seq.)[1] The court then ruled that a portion of the deed of trust was void and a portion remained valid. The court found (1) the Church official who obtained the secured loan from TVB committed fraud against the Church; (2) TVB was on "inquiry notice" of the fraud and did not engage in due diligence before approving the loan; and (3) the Church failed to disclose the fraud to First-Citizens after the Church learned of the encumbrance. The final judgment imposed a new deed of trust that secured only a portion of the prior debt.

Both parties appeal. We determine the court had no jurisdiction to consider the Church's challenges to the validity of the deed of trust because the Church failed to exhaust its administrative remedies under FIRREA. (§ 1821(d)(13)(D).) We thus conclude the court erred in rejecting First-Citizens' claim that the deed of trust was valid.

---

[1]     All undesignated statutory references are to title 12 of the United States Code.

Accordingly, we reverse the judgment and order the court to enter a new judgment in First-Citizens' favor on its declaratory relief claim and on the Church's cross-complaint.

FACTUAL AND PROCEDURAL SUMMARY

At all relevant times, the Church was governed by a Board of Elders (Board) responsible for spiritual, religious, and financial matters for the institution. The Board delegated many of its financial powers to Paul Winter, a long-time Church leader and successful investor who donated substantial sums to the Church. Winter served as treasurer and corporate secretary at various times, and had substantial control over all financial and banking matters related to the Church. Winter was an approved signatory on the Church's bank accounts, managed assets, negotiated and signed leases, and dealt with governmental authorities. He had the authority to open bank accounts and write checks, and he was the person designated to prepare all corporate compliance documents and corporate resolutions for the Church. The Board trusted Winter without reservation regarding all financial aspects of the Church.

In 2004, Winter formed a corporation (Western Christian Foundation (WCF)), which donated substantial funds to the Church. WCF was controlled by Winter, and was a public benefit corporation formed to provide gifts, contributions, and grants to qualified charities.

The Church's primary asset was improved real property in Escondido (the Property). The Church used the Property for its religious services and other related functions. In 2006, Winter proposed to the Board that it transfer the Property to WCF, to prevent frivolous lawsuits against the Church and allow Winter to use equity in the

3

Property "as collateral in order to borrow against it and earn a profitable return" for the Church's benefit. The Board supported this concept and instructed Winter to prepare the necessary documents for the Board's review. Despite this authorization, Winter took no immediate action to transfer the Property or obtain a loan.

Two years later, in about February 2008, a TVB senior vice president called Winter and asked if he was still interested in a loan secured by the Property. Without notifying the Board, Winter said he was interested and prepared documentation to transfer the Property to WCF and obtain loan approval from the bank's underwriting department. This documentation included a grant deed signed by Winter transferring the Property from the Church to WCF; an unsigned Church corporate resolution authorizing the transfer; and a leaseback agreement with the Church. Winter did not disclose the documentation to the Board, and TVB never communicated with any other Church official regarding the proposed loan.

Several months later, in August 2008, TVB approved the loan. Without obtaining reauthorization from the Board or disclosing the transaction, Winter (on WCF's behalf) obtained a $3.8 million line of credit secured by a deed of trust (Deed of Trust) on the Property now owned by WCF. At the time, the Property was valued at about $6.35 million.

Winter then invested a portion of the borrowed funds in short-term high interest real estate mortgage loans. In about May 2009, the federal government took over those investment funds as part of a criminal investigation and these funds were ultimately lost.

4

Shortly after, in July 2009, TVB became insolvent and on July 17, 2009, the FDIC was appointed receiver. Within a day or two, First-Citizens purchased TVB's assets (including the WCF secured loan). Winter was aware of TVB's collapse and that it had been taken over by the FDIC, and he communicated this information to Randy Armstrong, a member of the Church finance committee. During the next several months, the FDIC published several notices stating that all claims against TVB must be filed with the FDIC by October 20, 2009. (See *infra* at pp. 22-24.)

One or two months before this October 20 deadline, the Church retained Timothy Spivey as the head minister, and gave him significant control over the Church's finances and budget. In investigating the Church's assets, Spivey was surprised to learn WCF owned the Property and the Property had been encumbered with the Deed of Trust securing the WCF loan. At that point, Winter had withdrawn about $2.7 million from the credit line, and about $1.1 million remained.

On September 16, 2009, Spivey notified the Board of these facts. The Board members were initially "stunned, caught off guard." The next day the Board members had a lengthy meeting with Winter. After the meeting, the Board members told Spivey the Board had authorized the Property transfer *and* the secured loan "for the purpose of [Winter and WCF] being able to bring in more revenue" to the Church. They said they understood and agreed that WCF would borrow against the Property and invest the loan proceeds to further WCF's financial support of the Church.

When Spivey recommended that the Board remove Winter as treasurer and compel him to immediately pay back the borrowed money, the Board members

disagreed, believing Spivey "lacked understanding of [Winter], his personal wealth situation, his motives." They said Winter "has gobs of money. . . [and if] he wanted to pay it back, he could"; Winter was a powerful man and a very large donor to the Church; and Winter would "take it as a sign of distrust if they were to ask him those questions or to request that he give the money back on the spot." They expressed "confidence that if any money had been borrowed, it would be paid back very easily, so it really was no big deal," and that Winter would succeed in recovering the seized funds. They instructed Spivey not to tell the Church's finance team about the Property transfer and loan. Spivey testified that when he recommended that the Board take steps to freeze the line of credit, the Board members rejected this suggestion, stating they "felt like I was not understanding [Winter], his capacity for wealth, his motives. They felt like I was making a big deal of something that was really not a very big deal."

Thus, at that point, the Board made no effort to stop Winter/WCF from making further draws on the credit line, and did not notify First-Citizens there was any concern with the secured loan or any limits on Winter's authority regarding the loan. Nor did the Church file any claim with the FDIC challenging the loan or Winter's authority to have encumbered the Property. By March 31, 2010, Winter (through WCF) took an additional approximately $1.1 million, drawing the full amount of the $3.8 million credit line.

During the next several months, Church officials realized Winter would be unable to pay back the loan. In September 2010, the Board wrote to First-Citizens claiming (for the first time) that TVB had approved the loan without "proper authorization" from the Church's governing body. The Church asserted that TVB failed to conduct reasonable

6

due diligence and requested First-Citizens to relinquish the Deed of Trust. The letter stated that "[i]n the event that [First-Citizens] refuses our request to sign a Deed of Reconveyance and subsequently initiates foreclosure proceedings on [the] Property, we will immediately exercise our rights to seek all available legal and equitable remedies."

The Church then continued to make payments on the secured loan for several months. It also accepted a promissory note from an entity formed by Winter promising to repay the borrowed funds. However, in May 2011, the WCF loan went into default, and in November 2011, the Church recorded a grant deed retransferring the Property from WCF to the Church.

Less than one year later, in February 2012, First-Citizens filed a superior court complaint seeking a judgment quieting title to the property as being subject to the Deed of Trust and declaring the validity of the encumbrance. The Church answered and asserted numerous affirmative defenses, including that the conveyance of the Property from the Church to WCF was "fraudulent and therefore void and null"; TVB issued the line of credit in violation of applicable standards of care; and First-Citizens was not a bona fide encumbrancer for value of the Property.

Shortly before trial, the Church sought permission to file a cross-complaint against First-Citizens, seeking affirmative equitable relief in the form of an order declaring the Deed of Trust invalid. The Church argued there would be no prejudice because it was "merely seek[ing] formal legal redress as a result of the invalid trust deed" and "[t]hese very same issues were raised by [the Church] in its Answer." The parties then stipulated to the filing.

7

In February 2013, the Church filed its first amended cross-complaint, seeking to quiet title to the Property and for declaratory relief ordering that the Property is "[f]ree of all encumbrances," including the Deed of Trust. The factual basis for the pleading was the Church's allegation that First-Citizens' predecessor (TVB) had violated "safe and sound banking practices in extending the [$3.8 million] line of credit" to WCF, including by failing to obtain Board confirmation regarding Winter's authority and relying on documents that were not signed by authorized Church officials.

In June and July 2013, the court conducted a bench trial on the complaint and cross-complaint. Before and during trial, First-Citizens raised the issue that under FIRREA, the court had no jurisdiction over the Church's claims that the Deed of Trust was void or a nullity. First-Citizens relied on two FIRREA provisions: (1) section 1821(j), known as the injunctive relief prohibition; and (2) section 1821(d)(13)(D), known as the administrative exhaustion requirement.

First-Citizens alternatively argued the loan was valid and enforceable because Winter had the express authority to transfer and encumber the property for the Church's benefit and Church officials later ratified this authority by refusing to take any action once they learned of Winter's actions. First-Citizens claimed TVB acted according to applicable standards in approving the loan because the bank had a longstanding relationship with Winter as the Church's financial representative; the bank had no obligation to "police[ ]" the relationship between Winter and the Church; and First-Citizens and TVB were bona fide encumbrancers and thus could not be liable for

8

Winter's activities. First-Citizens argued that the losses were caused by a bad investment decision, and not its own conduct or TVB's loan approval.

In response, the Church argued FIRREA did not bar the action for numerous reasons, including that the FDIC was not a party to the action and FIRREA did not apply to affirmative defenses. On the first day of trial, the Church's counsel declined the court's invitation to stay the action to allow the Church to file an administrative claim with the FDIC. On the merits, the Church argued that the Deed of Trust was void or invalid because Winter "duped" the Church when he encumbered the Property; TVB "had a long-time chummy relationship with [Winter] and chose to bury its head in the sand in the face of known and obvious red flags . . ."; and TVB violated applicable standards and failed to engage in reasonable due diligence before approving the loan to WCF.

After considering the evidence and arguments, the court issued a statement of decision finding each party proved a portion of its case. The court initially rejected First-Citizens' FIRREA-based jurisdictional arguments. The court found the injunctive relief prohibition (§ 1821(j)) did not apply because the action was against a successor bank and not the FDIC. The court relied on a Ninth Circuit decision (*Henrichs v. Valley View Dev.* (9th Cir. 2007) 474 F.3d 609), and rejected conflicting Eighth Circuit authority (*Dittmer Props., L.P. v. FDIC* (8th Cir. 2013) 708 F.3d 1011). The court also summarily rejected First-Citizens' administrative exhaustion argument, finding it was "not persuasive." The court stated its conclusions "might be different" in a direct action between "the bank and the borrower."

9

On the merits, the court found TVB did not engage in due diligence in approving the loan because it "ignored numerous red flags." The court said the Board members were "forthright in their admission[s] that they *had* authorized the [Property] transfer, and that they had trusted . . . Winter," but the court found this "trust was clearly misplaced" and that Winter had committed "fraud" against the Church. (Italics added.) The court stated the Church was "innocent[ ]" and TVB was "on inquiry notice of Winter's fraud." But the court also found the Church did not act reasonably *after September 2009* because it failed to advise First-Citizens of its objections once it learned of the encumbrance, resulting in Winter drawing an additional $1,095,651.02 of unauthorized funds from the credit line.

Based on these multiple findings, the court found the Deed of Trust was valid to secure the portion of the funds withdrawn after September 2009 ($1,095,651.02, minus certain credits for amounts paid by the Church on the loan), but the Deed of Trust was invalid for the remaining amounts withdrawn before this date ($2,704,349.98). In so concluding, the court reiterated that Winter was "primarily responsible" for the losses; Winter "committed fraud on the Church, on TVB, on the County Assessor, and on the [title company]"; and Winter "abused a position of trust and breached numerous fiduciary duties." The court said "[u]nfortunately, Mr. Winter is not a party to this action."

In the final judgment, the court ordered the parties to "reform[ ]" the Deed of Trust "to reflect that it secures only the amount" of $968,321.27 plus interest of $211,470.71, and to delete the remaining indebtedness on the loan from the security.

10

## DISCUSSION

### I. *Overview*

Both parties appeal. In its appeal, First-Citizens challenges the court's rejection of its two jurisdictional challenges, and alternatively argues the Deed of Trust is valid as a matter of law because the undisputed evidence establishes: (1) First-Citizens and TVB were bona fide encumbrancers; (2) the Church ratified the conveyance of, and encumbrance on, the Property; and/or (3) the *D'Oench Duhme* doctrine bars the Church's claims (see *D'Oench, Duhme & Co. v. FDIC* (1942) 315 U.S. 447).

In its cross-appeal, the Church contends the court abused its discretion in concluding the Deed of Trust remains valid with respect to the portion of the outstanding loan amount withdrawn after September 2009.

We conclude the Church's defense and cross-complaint seeking to invalidate the Deed of Trust based on TVB's wrongful conduct are barred under FIRREA's administrative exhaustion provisions. It is undisputed the Church did not first present these claims under the FDIC's administrative procedures. Under well-settled law, FIRREA's requirement that a creditor or debtor of a failed bank exhaust its administrative remedies is a fundamental jurisdictional rule and implements vital public policy seeking to ensure the stability and continuity of our nation's financial systems. The Church's arguments that the rule is inapplicable in this case are without merit. Based on this conclusion, we do not reach the parties' additional arguments.

11

## II. *FIRREA Jurisdictional Defense*

### A. *Summary of FIRREA Statutory Scheme*

Congress enacted FIRREA in 1989 " 'in an effort to prevent the collapse of the [savings and loan] industry' in the late 1980s." (*Rundgren v. Wash. Mut. Bank, N.A.* (9th Cir. 2014) 760 F.3d 1056, 1060 (*Rundgren*).) To accomplish this, Congress granted the FDIC, as receiver, broad powers to quickly determine claims against failed financial institutions, and established a mandatory administrative procedure for parties to raise claims " 'without unduly burdening the District Courts.' " (*Henderson v. Bank of New England* (9th Cir. 1993) 986 F.2d 319, 320.)

" 'Congress' core purpose in enacting FIRREA . . . was to ensure that the assets of a failed institution are distributed fairly and promptly among those with valid claims against the institution . . . and to expeditiously wind up the affairs of failed banks.' " (*McCarthy v. FDIC* (9th Cir. 2003) 348 F.3d 1075, 1079 (*McCarthy*).) "[T]o liquidate a failed institution's assets 'in an orderly manner,' the receiver . . . require[s] timely notice of 'the entire array of claims' against an insolvent institution and 'an initial opportunity to consider them in a centralized claims process' in order 'to make rational and consistent judgments regarding which claims to allow or contest' or to 'settle . . . without resort to costly litigation' . . . ." (*Freeman v. FDIC* (D.C.Cir. 1995) 56 F.3d 1394, 1401 (*Freeman*); *2974 Properties, Inc. v. Resolution Trust Corp.* (1994) 23 Cal.App.4th 871, 877 (*2974 Properties*).)

To achieve these goals, "FIRREA establishes strict administrative prerequisites and deadlines that claimants must follow to lodge their claims and challenge any

12

denials." (*Miller v. FDIC* (7th Cir. 2013) 738 F.3d 836, 840.)  The exclusive scheme covers "all claims and actions against, and actions seeking a determination of rights with respect to, the assets of failed financial institutions for which the FDIC serves as receiver, including debtors' claims." (*Freeman, supra*, 56 F.3d at p. 1402.)

Under the statutory administrative procedures, once the FDIC is appointed receiver, it must establish a claims deadline, known as the " 'bar date.' " (*Saffer v. JPMorgan Chase Bank, N.A.* (2014) 225 Cal.App.4th 1239, 1247 (*Saffer*).)  The FDIC must publish notice of this deadline once a month for three months and the deadline must be at least 90 days after the date of the notice's first publication.  (§ 1821(d)(3)(B)(i), (ii); *Saffer, supra*, 225 Cal.App.4th at p. 1247.)  The FDIC must also mail a notice of the deadline "to any creditor shown on the institution's books."  (§ 1821(d)(3)(C).)

After an administrative claim is filed, the FDIC must allow or disallow the claim within 180 days and the claimant then has 60 days to seek additional administrative review or de novo judicial review of the receiver's decision.  (*Saffer, supra*, 225 Cal.App.4th at p. 1247; § 1821(d)(6)(A).)  "If the claimant fails to seek administrative or judicial review within the 60-day period, 'the claim shall be deemed to be disallowed . . . as of the end of such period, such disallowance shall be final, and the claimant shall have no further rights or remedies with respect to such claim.' (§ 1821, subd. (d)(6)(B).)" (*Saffer, supra*, 225 Cal.App.4th at p. 1247.)

The failure to exhaust these FIRREA administrative remedies deprives a court of subject matter jurisdiction.  (*Saffer, supra*, 225 Cal.App.4th at pp. 1262-1263, 1248-1249 ["administrative prerequisite to suit set forth in [FIRREA] has been strictly construed and

13

is considered an absolute and unwaivable jurisdictional requirement"]; *2974 Properties, supra*, 23 Cal.App.4th at pp. 878-880 ["unless a claimant has exhausted administrative claims process, no court has jurisdiction to hear the claim"]; *Tillman v. Resolution Trust Corp.* (4th Cir. 1994) 37 F.3d 1032, 1036 (*Tillman*) ["the administrative scheme provided in FIRREA is 'an absolute and unwaivable jurisdictional requirement' for judicial" consideration of claims]; see *Farnik v. FDIC* (7th Cir. 2013) 707 F.3d 717, 721 (*Farnik*); *Tellado v. IndyMac Mortg. Servs.* (3d Cir. 2013) 707 F.3d 275, 279-281; *Benson v. JPMorgan Chase Bank, N.A.* (9th Cir. 2012) 673 F.3d 1207, 1215 (*Benson*); *Elmco Props. v. Second Nat'l Fed. Sav. Ass'n* (4th Cir. 1996) 94 F.3d 914, 919 (*Elmco*); *Freeman, supra,* 56 F.3d at pp. 1399-1400; *Intercontinental Travel Mktg. v. FDIC* (9th Cir. 1994) 45 F.3d 1278, 1282-1284 (*Intercontinental*).)

The administrative-exhaustion jurisdictional bar applies to claims against successor banks (and not just against the FDIC) when the claim is based on the conduct of the failed institution.  (*Saffer, supra*, 225 Cal.App.4th at pp. 1255-1257; *Benson, supra*, 673 F.3d at pp. 1209, 1214; *Farnik, supra*, 707 F.3d at p. 722; *Vill. of Oakwood v. State Bank & Trust Co.* (6th Cir. 2008) 539 F.3d 373, 386.)  "[A]n entity that purchases a failed lending institution's assets from the FDIC acquires the administrative review protections afforded by section 1821(d)."  (*Lazarre v. JPMorgan Chase Bank, N.A.* (S.D.Fla. 2011) 780 F.Supp.2d 1320, 1325.)  "A claim asserted against a purchasing bank based on the conduct of a failed bank must be exhausted under FIRREA."  (*Benson, supra*, 673 F.3d at p. 1209.)

14

To the extent these rules may be harsh in an individual case, they were enacted with the broader public objective of protecting our nation's financial systems, maintaining confidence and stability in our financial institutions, and avoiding overburdening the court system with individual claims from bank creditors and debtors. Strictly enforcing rules is consistent with the "important purpose" of FIRREA's exhaustion scheme— "allowing the FDIC 'to perform its statutory function of promptly determining claims . . . to quickly and efficiently resolve claims against a failed institution without resorting to litigation.' " (*Intercontinental, supra*, 45 F.3d at p. 1285.)

## B. *Analysis*

The core of FIRREA's administrative exhaustion rule is contained in section 1821(d)(13)(D), which states: "Except as otherwise provided in this subsection, no court shall have jurisdiction over—[¶] (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [FDIC] has been appointed receiver . . . ; *or (ii) any claim relating to any act or omission of such institution or the [FDIC] as receiver*." (Italics added.)

The Church's claims against First-Citizens fell within subpart (ii) of section 1821(d)(13)(D) because they were based on challenges to the "act[s] or omission[s]" of the failed institution (TVB). (See *Farnik, supra*, 707 F.3d at pp. 723-724; see also *Rundgren, supra*, 760 F.3d at p. 1064; *Westberg v. FDIC* (D.C.Cir. 2014) 741 F.3d 1301, 1305-1306.) The Church acknowledges it did not submit its claims to the FDIC for administrative review. On its face, this failure to exhaust administrative remedies

15

precludes the court's jurisdiction to consider the Church's claims regarding the Deed of Trust.

The Church nonetheless argues the jurisdictional bar is not applicable because: (1) its challenges to the validity of the Deed of Trust were affirmative defenses; (2) the FDIC did not provide, and the Church did not receive, adequate statutory notice of the takeover and/or of the bar date; and (3) the jurisdictional bar does not apply to its fraud-based claims. For the reasons explained below, we reject these contentions.

### 1. *Affirmative Defense*

Because section 1821(d)(13)(D) refers to a "claim" or "action," courts have interpreted the administrative-exhaustion bar to apply only to claims or counterclaims and *not* to affirmative defenses. (*American First Fed., Inc. v. Lake Forest Park, Inc.* (11th Cir. 1999) 198 F.3d 1259, 1264 (*American First*); *Resolution Trust Corp. v. Midwest Fed. Sav. Bank* (9th Cir. 1993) 36 F.3d 785, 792-793 (*Midwest Federal*); *National Union Fire Ins. Co. v. City Sav., F.S.B.* (3d Cir. 1994) 28 F.3d 376, 392-394 (*National Union*).) "However, a court must look beyond the nomenclature of a request for relief to ascertain whether it is a true affirmative defense or is, in actuality" a counterclaim. (*American First, supra*, at p. 1264.) "Whether a request for relief is titled an affirmative defense or a counterclaim is not dispositive to the question of subject matter jurisdiction." (*Ibid.*) "Courts should not allow parties to avoid the procedural bar of [section] 1821(d)(13)(D) by simply labelling what is actually a counterclaim as a defense or affirmative defense." (*National Union, supra*, 28 F.3d at p. 394.) The administrative exhaustion requirement applies if "the remedy sought by a party,

16

regardless of its label, . . . is in reality a claim against the assets or actions of the failed institution . . . ."  (*American First, supra*, at pp. 1264-1265.)

There is no bright-line rule for distinguishing between a counterclaim for which the FIRREA exhaustion requirement applies and an affirmative defense for which the requirement does not apply.  And the cases have not always been consistent.  But on our review of the federal and state decisions and our consideration of the congressional intent underlying the rule, we are satisfied the proper focus of the analysis is to determine whether the party asserting an "affirmative defense" had an independent basis for bringing the claim in the administrative arena.  If so, the claim is barred if the party did not exhaust administrative remedies.  (See *Rundgren, supra*, 760 F.3d at pp. 1063-1064; *Midwest Federal, supra*, 36 F.3d at p. 793 [party may successfully assert affirmative defenses without exhausting FIRREA administrative procedures if the party "had no [prior] independent basis for filing a claim against" the receiver]; *Resolution Trust Corp. v. Schonacher* (D.Kan. 1994) 844 F.Supp. 689, 694; *FDIC v. Martini* (D.Md. 1995) 1995 WL 168139, *5.)  This independent-grounds test implements congressional intent to strictly provide the FDIC with the initial opportunity to assess and resolve all claims identified in section 1821(d)(13)(D) before the claim may be asserted in the courts, while ensuring parties retain the right to assert defenses that could not have been foreseen or effectively brought *until an affirmative claim is asserted against the party*.

This test was satisfied in this case.  The Church's counterclaims and affirmative defenses were identical.  Both sought to remove the encumbrance from the Property based on TVB's alleged wrongful conduct in approving the loan and in failing to inquire

17

regarding the scope of Winter's authority. The Church could have (and in fact did) independently assert this challenge before First-Citizens brought its declaratory relief action. In September 2009, the Board was aware the Property had been transferred to WCF, and a deed of trust had been placed on the Property securing a $3.8 million credit line. About one year later, the Church demanded that First-Citizens take action to reconvey the Deed of Trust to remove it as an encumbrance on the Property, asserting Winter's lack of authority as a basis for this demand and claiming a right to obtain affirmative relief.

In later raising this challenge as an affirmative defense, the Church did not seek merely to prevent the purchasing bank from relying on its security interest because of a legal or procedural infirmity with the claim. Rather, it affirmatively sought to reduce the value of the FDIC's former assets (the secured loan) by removing the encumbrance from the Property. If the Church had first filed its own action alleging the invalidity of the Deed of Trust and seeking its removal, this claim would clearly be covered by the administrative exhaustion rule. Likewise, if First-Citizens had dismissed its complaint, leaving only the Church's cross-complaint to adjudicate, there would be no question but that the claim would be barred by the rule.

Under FIRREA's language and purpose, the applicability of the exhaustion requirement in this case does not depend on which party filed the initial pleading. The Church was required to characterize its allegations as "affirmative defenses" because of the procedural posture of the case. But this label did not alter the fact that the *substance* of the challenges was an *independent* affirmative claim challenging the actions of the

18

failed institution that functionally could have been resolved in the administrative process, without First-Citizens first filing a lawsuit. The Church's affirmative defenses were thus subject to the administrative exhaustion rule under section 1821(d)(13)(D). (See *Rundgren, supra*, 760 F.3d at p. 1064;[2] *LNV Corp. v. Harrison Family Bus., LLC* (D.Md. 2015) 2015 WL 5836903, *10 [administrative exhaustion bar applied to affirmative defenses where "defenses are, in substance, repackaged counterclaims"]; *FDIC v. Soliz* (M.D.Fla. 2015) 2015 WL 1138421, *4-*5; *Centerstate Bank of Florida v. John Emmons' Taekwondo, Inc.* (M.D.Fla. 2015) 2015 WL 310607, *3.)

The circumstances here are distinguishable from the cases relied upon by the Church. For example, in *National Union, supra*, 28 F.3d 376, the court found the administrative exhaustion doctrine was inapplicable to the party's contract rescission defense, noting that because "a party cannot know what her defense is until she hears the claim leveled against her, it seems it would be nearly impossible for a party to submit future hypothetical defenses to the administrative claims procedure . . . ." (*Id.* at p. 395.) In this case, the Church's claims were not unknown or dependent on the nature of First-Citizens' claims. It was the Church that repeatedly and affirmatively sought to remove the Deed of Trust from its property; its claim regarding TVB's lack of due diligence in approving the loan was, in substance, an affirmative claim and not an affirmative defense.

---

[2] In *Rundgren*, the debtors filed the action first, but the crux of the court's reasoning was that labels are not controlling and the debtors' claim seeking to forestall a foreclosure action was not in substance an affirmative defense. (*Rundgren, supra*, 760 F.3d at pp. 1061-1064.)

19

## 2. *Notice Requirement*

The Church contends it was excused from the exhaustion requirement because it failed to receive adequate notice of the receivership and/or the bar date. We reject this contention because the lack of notice does not permit a party to avoid the administrative exhaustion bar. Further, the undisputed facts show the Church had adequate prior notice.

### 2.a. *Applicable Notice Principles*

FIRREA requires the FDIC to provide two different kinds of notice. First, the FDIC must mail a notice to any *known creditor* shown on the failed institution's books at the time of the initiation of the receivership. (§ 1821(d)(3)(C)(ii).) Second, the FDIC must promptly publish notice regarding the receivership and of the bar date. (§ 1821(d)(3)(B)(i),(ii).)

Despite the importance of these notices, it is settled that the FDIC's failure to comply with these notice requirements does not excuse a plaintiff from filing a claim with the FDIC. (*McCarthy, supra*, 348 F.3d at p. 1081 ["[the Ninth Circuit has] already held that failure to give notice does not render the [FIRREA] administrative claims process inapplicable"]; *Freeman, supra*, 56 F.3d at p. 1402 [FDIC's failure to provide proper notice " 'does not relieve the claimant of the obligation to exhaust administrative remedies, because the statute does not provide for a waiver or exception under those circumstances' "]; *Saffer, supra*, 225 Cal.App.4th at pp. 1258-1260.)

To avoid the harshness of these rules, FIRREA provides limited relief under certain narrow circumstances. (§ 1821(d)(5)(C)(ii).) Under the statutory exception, the FDIC may consider a late claim (one filed after the bar date) *if* the claimant shows it did

20

not have timely notice *of the receivership*. (*Saffer, supra*, 225 Cal.App.4th at p. 1259; *Intercontinental, supra*, 45 F.3d at p. 1285.)  The absence of notice of the receivership is the relevant fact; the lack of notice of the bar date is not material.  (*Saffer, supra*, 225 Cal.App.4th at p. 1259; see *RTC Mortg. Trust 1994-N2 v. Haith* (8th Cir. 1998) 133 F.3d 574, 579.)  If the claimant knows of the FDIC's involvement, it must file a timely claim. (*Ibid.*)  Additionally, the exception applies if the events underlying the claims took place *after* the bar date.  (See *Potter v. JPMorgan Chase Bank, N.A.* (C.D.Cal. 2013) 2013 WL 1912718 (*Potter*).)  This exception focuses solely on the date of the relevant events, and not on the party's claimed knowledge or lack of knowledge of these events.  (*Ibid.*)  The *Potter* court explained:

> "[R]ecognizing a broad exception for claimants without knowledge of their claims prior to the bar date runs contrary to FIRREA's purpose of empowering the FDIC to expeditiously resolve claims against a failed bank's assets without placing an undue burden on federal district courts.  Determining whether a claimant knew or should have known about a claim prior to the bar date is potentially a complex, fact intensive determination.  Requiring courts to make this determination would burden both the courts and the FDIC with significant litigation over claims filed after the claims bar date.  This result would undermine . . . both the meaningfulness of the statutorily imposed claims bar date and FIRREA's purpose . . . .  In contrast, the existing rule—which focuses on whether a claim is based on events taking place after the bar date—is more easily administrable.  While it may not always be clear whether a claim arises out of pre-bar date events or post-bar date events, this inquiry is . . . more straightforward than an inquiry complicated by taking into account a plaintiff's knowledge.  A rule limited to claims that could not possibly have been filed prior to the bar date is therefore more closely in accord with FIRREA's purpose." (*Id.* at p. *9.)

Further, even assuming the claimant can establish the applicability of this statutory exception (§ 1821(d)(5)(C)(ii)), the exception does not excuse the administrative

21

exhaustion requirement—it merely allows a party to file a late claim *with the FDIC*. (*Saffer, supra*, 225 Cal.App.4th at pp. 1260-1261; see *Freeman, supra*, 56 F.3d at p. 1402 ["*only* statutorily-specified exemption from the strict requirements of the administrative claims process is provided if 'the claimant did not receive *notice of the appointment of the receiver* in time to file . . . [a] claim . . . , and even in that case the only consequence is that the FDIC 'may' consider a late-filed claim, provided the claim is filed 'in time to permit payment' "]; *Avery v. FDIC* (D.C.Cir. 2015) __ F.Supp.3d __ [2015 WL 3961191, *3].)

### 2.b. *Notice Analysis*

In this case, the FDIC takeover occurred on July 17, 2009. On that date, the Church was not a known creditor on TVB's books. The Church was a *debtor*, not a creditor, and its claim against TVB had not yet been asserted. On these facts, the FDIC was not required to mail notice of the receivership and bar date to the Church. (See *McCarthy, supra*, 348 F.3d at p. 1081.) Likewise, First-Citizens had no duty to notify the Church of the administrative exhaustion requirement. It is the FDIC and not the successor entity that is responsible for providing the requisite notice.

The FDIC's bar date for claims against TVB was October 20, 2009. First-Citizens did not present evidence in the proceedings below that it published the required notices of this bar date. However, on appeal, First-Citizens requests that we take judicial notice of this fact.[3] We grant this motion. (See Evid. Code, § 452, subds. (c), (h); *Saffer, supra*,

---

3    The opposed judicial notice request includes a declaration from an FDIC official authenticating documents showing the FDIC published the receivership notices on

22

225 Cal.App.4th at p. 1244, fn. 2 [Court of Appeal granting judicial notice request of FDIC's published notices of bar date].)

Although reviewing courts generally do not take judicial notice of evidence not presented to the trial court, an exception may apply in exceptional circumstances if the matters to be judicially noticed are not reasonably open to dispute, there is a reasonable basis for the party's failure to submit the evidence below, and there is no prejudice. (See *People v. Hardy* (1992) 2 Cal.4th 86, 134-135; *People v. Belcher* (1974) 11 Cal.3d 91, 94, fn. 2.) These circumstances are present here. Based on the statutory proofs of publication and the official governmental nature of the documents, the fact these FDIC notices were published in the three newspapers on the specified dates is not reasonably open to dispute. (See *Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 752-753; *Saffer, supra*, 225 Cal.App.4th at p. 1244, fn. 2; *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807, fn. 5.) Additionally, the record shows First-Citizens did not submit these documents during trial because the fact that Church officials were aware of the FDIC's receivership did not initially appear to be disputed, and it was only on the last day of trial that one Church Board member retracted his earlier testimony, creating a potential factual challenge on the notice issue. When First-Citizens' counsel expressed concern to the court that he might need to introduce further evidence on this issue after hearing the changed testimony, the court indicated no additional

specific dates in July, August, and September 2009. The notices identify the October 20 bar date and state the failure to file claims by that date "will result in disallowance by the Receiver" and the "disallowance will be final." The documents include statutory proofs of the publications from The Press-Enterprise (Riverside), The San Diego Union-Tribune, and the Los Angeles Times.

evidence would be necessary because it was satisfied the Church was aware that the FDIC had taken over the bank, even if the evidence was disputed on the issue whether the Church had actual notice of the existence of administrative remedies.

But even assuming this new evidence is not considered, First-Citizens presented unrefuted evidence that at least two Church officials—Winter and Anderson—had actual notice of the FDIC's takeover in time to file the claim. Winter testified that in July 2009, he was handling the banking for the Church and he was aware the FDIC took over TVB, although he did not know the "exact date." He also testified he was aware that First-Citizens reopened the bank and took over management of the Church's accounts. Armstrong (who handled financial matters for the Church) similarly indicated that he learned of the "bank changeover" at some time "around" September 2009, and that he learned in an email from Winter that "First-Citizens Bank had taken over through the FDIC."

On this record, the Church had actual notice of the FDIC's receivership before the bar date. Notice to an entity is accomplished by providing notice to officers or those in a management capacity. (*Moore v. Phillips* (1959) 176 Cal.App.2d 702, 709.) To the extent Winter did not sufficiently convey the notice to other Church members or to the Board, the Church would possibly have a potential claim against him, but not against First-Citizens, who was not responsible for the notice. Additionally, the testimony of Armstrong corroborates that Winter did communicate this notice and therefore confirms the notice.

24

The Church argues that even if it had adequate notice of the FDIC takeover, this notice was not sufficient to permit it to file a claim because it was unaware of the facts of Winter's fraud *and* the Bank's "*complicity*" with that fraud before the bar date. The argument does not support an exception to the exhaustion requirement.

First, the court specifically found that "after learning of the transfer and the note [in September 2009], the [Board members] met, confirmed Winter had permission to proceed as he had . . ." and that "in the weeks and months following the revelation of the transfer and encumbrance, the current and/or previous [Church] Elders . . . stated publicly to the membership that, the transfer had been authorized . . . ." At that point, it was undisputed the Church officials knew (or had the information in their possession) regarding what documents were *or were not* used to authorize this transfer and encumbrance at the time, and thus were at least on inquiry notice of TVB's actions with respect to the credit line and Deed of Trust.

More important, even assuming the Church did not learn the full extent of its claims until after the bar date, this fact does not excuse the administrative exhaustion requirement under FIRREA. If the events giving rise to the claim occurred before the bar date and the claimant had notice of the receivership, the bar date remains the deadline regardless of the knowledge of the claim. (*Potter, supra*, 2013 WL 1912718.) Additionally, as explained above, lack of notice may provide a basis for filing a late action with the FDIC, but does not create jurisdiction in the courts to consider the claims in the first instance.

To the extent the Church argues its due process rights were violated because of the claimed lack of adequate notice, the courts have rejected similar arguments. First, the courts have found constructive notice through the publication process is consistent with due process principles. (*Saffer, supra*, 225 Cal.App.4th at p. 1259; see *Mullane v. Cent. Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 317.) Additionally, the courts have found the statutory scheme includes the necessary due process because it provides a forum for considering a party's claims, including late claims. The due process requirement seeks to ensure a party is "given an opportunity for a hearing before [it] is deprived of any significant property interest . . . ." (*Freeman, supra*, 56 F.3d at p. 1403, italics omitted; *Feigel v. FDIC* (S.D.Cal. 1996) 935 F.Supp. 1090, 1099-1100.) In this case, the Church had notice and an opportunity to be heard prior to the claimed deprivation. The Church had an opportunity to present its claims to the FDIC, and to have those claims resolved through the administrative claims process, subject to de novo judicial review in the district court. The availability of this administrative process (with judicial review rights) avoids any constitutional infirmity. (See *McCarthy, supra*, 348 F.3d at p. 1081; *Dobbins v. Dobbins* (W.D.Okla. 2015) 2015 WL 3952737, *4.)

### 3. *Fraud-Based Claim*

As a central theme of its appellate briefing, the Church contends the jurisdictional rules are inapplicable because they do not apply to "fraud-based" claims. The argument is without merit.

First, the Church's claim against First-Citizens is not "fraud-based." The Church did not assert a fraud claim against First-Citizens. Instead, in its cross-complaint, it

26

sought to invalidate the Deed of Trust based on TVB's *negligent* conduct. The fact that *Winter* may have misrepresented facts to the Board about the safety or security of the proposed investments, or intentionally failed to inform the Board of the transfer and encumbrance, means (as the court found) that Winter may have engaged in fraudulent conduct against the Church. But it does not mean the Church has a viable fraud claim against First-Citizens.

Equally important, there is no authority supporting the Church's contention that the administrative exhaustion requirement does not apply to a fraud-based claim. FIRREA's exhaustion requirement applies to *any* claim or action concerning the assets of a failed institution for which the FDIC has been appointed receiver. (*McCarthy, supra*, 348 F.3d at p. 1081; accord, *Westberg v. FDIC* (D.C.Cir. 2014) 741 F.3d 1301, 1303.) FIRREA " 'bars judicial review of any non-exhausted claim, monetary or nonmonetary, which is "susceptible of resolution through the claims procedure." ' " (*Rundgren, supra*, 760 F.3d at p. 1061.)

Under this broad rule, the courts have applied the administrative exhaustion bar to claims asserting fraud and other forms of intentional misconduct. (See, e.g., *Rundgren, supra*, 760 F.3d at pp. 1059, 1064 [administrative exhaustion doctrine barred borrower's claim challenging enforceability of secured loan agreement and mortgage based on a failed bank's "deceptive and fraudulent actions to induce them to enter into a loan agreement"]; *Benson, supra*, 673 F.3d at pp. 1208-1209; see also *Farnik, supra*, 707 F.3d at p. 719.) Further, there is no basis for finding the Church's claims were not susceptible of resolution through the claims procedure.

27

We also find unpersuasive the Church's contention the FIRREA statutory scheme is inapplicable because the grant deed transferring the Property from the Church to WCF was "void." In support of this contention, the Church relies on *Langley v. FDIC* (1987) 484 U.S. 86, which concerned an interpretation of a different federal statute codifying the *D'Oench Duhme* doctrine. (§ 1823(e).) The *Langley* court held the *D'Oench Duhme* doctrine applies to voidable instruments, but not to void documents because the latter documents have no legal effect. (*Langley*, at pp. 93-94.) *Langley* noted that a void document results from "fraud in the factum—that is, the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents," whereas a document is "voidable" if it results from "fraud in the inducement." (*Id.* at p. 94.)

California law recognizes a similar distinction between void and voidable contracts. When a party is unaware he or she has signed a contract and/or did not intend to enter into a contract, the contract is void. (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415.) But if the party is induced to sign a contract by fraud, the contract is voidable, and not void. (*Ibid.*; *Schiavon v. Arnaudo Bros.* (2000) 84 Cal.App.4th 374, 380.) Likewise, a contract intentionally signed by an agent without authority to enter into the contract is generally voidable, and not void. (See *Streetscenes v. ITC Entertainment Group, Inc.* (2002) 103 Cal.App.4th 233, 242; 3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency & Employment, § 139, p. 184; Civ. Code, §§ 2307, 1588; see also Rest. 2d Contracts, § 7; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 2, p. 60.) A voidable contract may be ratified and is not a transaction that

28

lacks legal effect. (See Civ. Code, § 1588; *Fergus v. Songer* (2007) 150 Cal.App.4th 552, 571.)

Under these principles, the property transfer from the Church to WCF and the execution of the secured loan documents were at most voidable and not void. The court found the Church gave Winter the authority to act on its behalf with respect to its financial affairs, but Winter intentionally abused this authority to accomplish a transfer of the Church's assets to his own entity. With TVB's assistance, Winter was able to obtain a secured loan on the Property. The Church Board members later made a deliberate decision to affirm this transfer based on Winter's false assurances.

These factual findings show wrongful conduct on the part of Winter, and that Winter may have acted beyond his authority in transferring the Property and obtaining the secured loan. But they do not support that Winter had no authority to engage in financial transactions on behalf of the Church or that he did not know what he was signing. Based on the court's factual findings, the deed transfer was potentially voidable if the Church had sued Winter or WCF, but the transfer was not a void transaction in the sense that it had no legal effect. Although the court characterized the transactions as "void," this legal conclusion was not supported by its factual findings. Thus, even assuming *Langley*'s void/voidable distinction applies to FIRREA, *Langley* is inapplicable because the challenged instruments were voidable, not void.

Because the Church did not exhaust its administrative remedies under section 1821(d), the court had no jurisdiction to consider the Church's claims that Winter's and/or TVB's conduct established the invalidity of the Deed of Trust.

29

## DISPOSITION

We reverse the judgment.  The court is ordered to enter a new judgment in favor of First-Citizens on its declaratory relief claim and on the Church's cross-complaint.  The Church to bear First-Citizens' costs on appeal.

HALLER, Acting P. J.

WE CONCUR:

McINTYRE, J.

O'ROURKE, J.

30